Sidney MORSE, et al.

v.

R. Clayton MCWHORTER, et al.

No. 97–CV–0370.

United States District Court, M.D. Tennessee, Nashville Division.

July 28, 2000.

Report and Recommendation Corrected as of July 13, 1998.

Order Denying Motion to Amend Oct. 6, 2000.

Paul Kent Bramlett, Bramlett Law Offices, Nashville, TN, George Edward Barrett, Barrett, Johnston & Parsley, Nash-

ville, TN, Stuart D. Wechsler, Robert I. Harwood, Samuel K. Rosen, Daniella Quitt, Wechsler, Harwood, Halebian & Feffer, LLP, New York City, Scott W. Fisher, Noah Silverman, Bruce E. Gerstein, Barry S. Taus, Garwin, Bronzaft, Gerstein & Fisher, LLP, New York City, Louis R. Lucas, Lucas & Thompson, Memphis, TN, Karen L. Morris, Liam G. B. Murphy, Abraham Rappaport, Irving Morris, Wilmington, DE, for plaintiffs.

Steven Allen Riley, Bowen, Riley, Warnock & Jacobson, Nashville, TN, Paul H. Dawes, Latham & Watkins, Washington, DC, William J. Meeske, Latham & Watkins, Los Angeles, CA, for defendants.

John D. Kitch, Nashville, TN, David D. Aufhauser, Dennis M. Black, Williams & Connolly, Washington, DC, for Richard L. Scott.

James Galloway Thomas, Neal & Harwell, Nashville, TN, for David T. Vandewater.

## MEMORANDUM

HIGGINS, District Judge.

By order (Docket Entry No. 101) entered February 10, 1998, this action was referred to the Magistrate Judge for consideration and submission of proposed findings of fact and recommendation for disposition. In his Report and Recommendation (filed July 1, 1998; Docket Entry No. 157), the Magistrate Judge recommended that the plaintiffs' motion (filed April 2, 1998; Docket Entry No. 131) to take judicial notice be denied; the motion (filed January 9, 1998; Docket Entry No. 90) to dismiss of defendant Richard L. Scott be granted; the motion (filed January 8, 1998; Docket Entry No. 75) to dismiss of defendant David T. Vandewater be granted; the motion (filed January

8, 1998; Docket Entry No. 83) to dismiss of defendants Columbia/HCA HealthCare Corporation;[1] Thomas F. Frist, Jr., R. Clayton McWhorter, Carl E. Reichardt, Magdalena Averhoff, T. Michael Long, and Donald S. MacNaughton be granted, their motion (Docket Entry No. 83) to strike be denied as moot and their motion (Docket Entry No. 86) to take judicial notice of exhibits submitted in support of their motion to dismiss and strike be granted.

Before the Court are the plaintiffs' objections (filed July 7, 1998; Docket Entry No. 161) to the Report and Recommendation and motion for de novo determination; the defendants' responses (filed August 31, 1998; Docket Entry Nos. 165–167) and motions for de novo determination.

The Court has jurisdiction over this matter under 15 U.S.C. § 77(v) and 15 U.S.C. § 78aa.

For the reasons set forth below, the plaintiffs' objections to the Magistrate Judge's conclusions (Docket Entry No. 161) are sustained in part and overruled in part. Accordingly, the conclusions of the Report and Recommendation will be adopted as modified and the defendants' motions to dismiss will be granted.

## I.

Members of the proposed class of plaintiffs were owners of common stock of defendant, Columbia/HCA HealthCare Corporation, who acquired the stock from April 9, 1994, to September 9, 1997. Columbia/HCA is a publicly owned corporation and is one of the largest healthcare providers in the United States. The individual defendants in this action, Drs. Frist and Averhoff, and Messrs. Scott, Vandewater, McWhorter, Long, MacNaughton

1. Since this action was commenced, Columbia/HCA HealthCare Corp. has changed its name to The Healthcare Company.

and Reichardt, were officers and/or board members of Columbia/HCA during the proposed class period.

The plaintiffs claim that the defendants violated the following securities laws:

(1) Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, prohibiting fraudulent, material misstatements or omissions in connection with the sale or purchase of a security;

(2) Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), providing liability of controlling persons;

(3) Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, prohibiting material misstatements or omissions in registration statements;

(4) Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2), providing for liability for making a securities offering "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements... not misleading"; and

(5) Section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, prohibiting material misstatements or omissions in proxy statements.

The plaintiffs' claims arise out of statements, corporate reports and public filings that they claim are false or misleading. The plaintiffs contend that during the proposed class period, the defendants engaged in improper business practices which caused Columbia's revenues to be artificially inflated and either omitted or misrepresented this information to the plaintiffs in corporate statements, reports and filings.

In the motion (Docket Entry No. 83) to dismiss the plaintiffs' amended complaint or in the alternative, to strike portions of the amended complaint, the defendants asserted that:

(1) the plaintiffs' Rule 10b–5 claims must fail because (a) the alleged misstatements and omissions were not actionable; (b) the plaintiffs failed to satisfy the pleading requirements for fraud under Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 with respect to the defendants' scienter; (3) as to Dr. Frist, Messrs. McWhorter, Reichardt, Long and McNaughton and Dr. Averhoff, the amended complaint failed to adequately tie them, as outside directors, to the alleged false and misleading statements or alleged business practices;

(2) because the plaintiffs' Rule 10b–5 claims must fail, the plaintiffs' claims under Section 20 of the 1934 Act, 15 U.S.C. § 78t(a), must also fail;

(3) the plaintiffs' claims under Section 11 and 12 of the 1933 Act, 15 U.S.C. §§ 77k(a) and 77l, and Section 14 of the 1934 Act, 15 U.S.C. § 77n, must fail because the alleged misstatements upon which these claims are based are true; and

(4) in the alternative, the allegations of the plaintiffs in ¶¶ 48–57 and ¶ 80 should be stricken because they are immaterial to any of the plaintiffs' claims.

In his motion (Docket Entry No. 75) to dismiss, Mr. Vanderwater, in large part, adopted the arguments of these defendants. In addition, he notes he did not sign any documents filed with the SEC.

Mr. Scott essentially also adopted the assertions of the other defendants. Richard L. Scott's motion (Docket Entry No. 90) to dismiss.

## II.

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "well pleaded facts" set forth in

the complaint must be accepted by the Court as true. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). The Court's duty in reviewing a motion to dismiss is to determine the legal sufficiency of the complaint. *In re Sirrom Capital Corp. Sec. Litig.,* 84 F.Supp.2d 933, 937 (M.D.Tenn.1999)(citing *City of Toledo v. Beazer Materials and Serv., Inc.,* 833 F.Supp. 646, 650 (N.D.Ohio 1993)). The Court may only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957)(footnote omitted). As the function of the Court considering a motion to dismiss is to "to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the Complaint is true," the Court must consider the allegations in the complaint in the light most favorable to the party opposing the motion. *In re Sirrom Capital Corp. Sec. Litig.,* 84 F.Supp.2d 933, 937 (M.D.Tenn.1999).

### A. *Rule 10b–5 Claim*

The Sixth Circuit has found that in order to state a claim under Rule 10b–5 "a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omissions of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *In re Comshare Sec. Litig.,* 183 F.3d 542, 548 (6th Cir.1999)(citing *Aschinger v. Columbus Showcase Co.,* 934 F.2d 1402, 1409 (6th Cir.1991)).

### 1. *Actionable Statements or Omissions*

The plaintiffs contend that the defendants were required to disclose that Columbia's revenues and earning were illegally inflated and that they failed to do so in violation of Rule 10b–5.[2] The Magistrate Judge concluded that the plaintiffs' claim must fail because they could not establish that the defendants had a duty to make such disclosures.

It is a violation of Rule 10b–5 to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...." 17 C.F.R. § 240.10b–5(b). Accordingly, there must be a duty to disclose on the part of a defendant before he or she can be found to violate Rule 10b–5 on the basis of nondisclosure. *Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194, 213 n. 17 (1988)("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). The duty to disclose does not arise simply because information at issue is material. *Murphy v. Sofamor Danek Group, Inc.,* 123 F.3d 394, 400 (6th Cir.1997) (citations omitted).

The plaintiffs first allege that Columbia stated in its 10–Q forms "in the substance" that Columbia's legitimate business practices were the basis for its revenues and earnings growth, when the revenues and growth were actually based on the company's "improper procedures." Plaintiffs' memorandum (Docket Entry No. 162) at 18. Second, the plaintiffs rely on the statement in Columbia's 10–K forms that the government was investigating Colum-

---

**2.** Specifically, the plaintiffs contend that Columbia's revenues were the result of:"(1) 'upcoding' of Medicare, Medicaide and insurance claims; (2) 'unbundling' of lab tests; (3) filing 'cost reports' with the Health Care Finance Administration ('HCFA')(the agency responsible for administering Medicare) that con-

cealed non-allowable items; (4) improperly shifting Medicare costs to realize a greater reimbursement; and (5) shifting to the government the cost of acquiring hospitals and overhead or 'administrative and general costs' which were not reimbursable." Plaintiffs' memorandum (Docket Entry No. 162) at 19.

bia's procedures for preparing Medicare cost reports, but that "[m]anagement believes that any claims in this regard, if asserted, would not have a material adverse effect on the Company's financial position or results of operation." *Id.* at 17. The plaintiffs also base their claims on statements in the 10–K forms that, even if the government audit changed the amount Columbia initially anticipated being reimbursed for Medicare and Medicaid charges, "[m]anagement believes" that any adjustment to the reimbursements would not have a " 'material adverse effect on the Company's results of operations or financial position.' " *Id.* at 17. Next, the plaintiffs contend that Columbia's 10–K forms were misleading because they stated that Columbia operated various facilities and provided services which were "an integral component of the Company's strategy to develop a comprehensive health care network in each of its target markets," while failing to disclose that Columbia artificially inflated revenues. *Id.* at 19–20. Finally, the plaintiffs contend that the defendants falsely stated that the company was in compliance with the Stark Laws. *Id.* at 25.

The Magistrate Judge found that the statements at issue were not actionable because the "[p]laintiffs' claim of inflated revenues is not hard information, but is controlled by the issue of the legality of Columbia's business practices." Report and Recommendation (Docket Entry No. 157) at 46. In reaching his conclusion, the Magistrate Judge relied on the opinion of the Sixth Circuit in *Sofamor Danek*, 123 F.3d 394. In that case, the plaintiffs asserted that the defendant, a manufacturer of medical devices, made misleading and incomplete statements to the public in violation of Rule 10b–5 that attributed its increased revenues to legitimate business practices and market conditions when, in fact, the increases were also partially attributable to the company's unlawful promotion of certain products and other improper practices. *Id.* at 400.

The Sixth Circuit found that:

[t]he proposition that the company was engaging in illegal promotion of its products.... is *not* a proposition that can fairly be said to fall into the category of "hard" information. Hard information "is typically historical information or other factual information that is objectively verifiable.... Such information is to be contrasted with "soft" information, which includes predictions and matters of opinion."

*Id.* at 401 (citing *Lewis v. Chrysler Corp.*, 949 F.2d 644, 652 (3rd Cir.1991)(emphasis added)). As soft information " 'must be disclosed only if . . . virtually as certain as hard facts,' " the Court found that Sofamor Danek was not required to disclose that the company was engaged in illegal activities. *Id.* at 402 (quoting *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir.), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986)).[3]

### a. Columbia's 10–K forms

Columbia states in its 10–K forms that the government was investigating Columbia's procedures for preparing Medicare cost reports, but that "[m]anagement believes that any claims in this regard, if asserted, would not have a material adverse effect on the Company's financial position or results of operation." The 10–K forms also state that "[m]anagement

---

**3.** In contrast, the Sixth Circuit observed that Sofamor Danek did disclose such hard information, such as the fact that it had received a warning letter from the FDA with respect to its activities. Additionally, "[e]ach of the company's 10–K forms explicitly mentioned the risk that the FDA might obtain an injunction against any distribution of the Bone Plate and Screw Product Line." *Sofamor,* 123 F.3d at 402.

believes" that any adjustment to the reimbursements would not have a " 'material adverse effect on the Company's results of operations or financial position.' " These are statements of opinion. Amended complaint (Docket Entry No. 73) at 17. The Magistrate Judge concluded that the plaintiffs cannot sustain their Rule 10b–5 claims based on these alleged misrepresentations by the defendants because, under *Sofamor*, " 'any opinions expressed by Columbia are not actionable.' " Report and Recommendation (Docket Entry No. 157) at 50.

The plaintiffs contend that the Magistrate Judge failed to recognize that a securities fraud action may be based on opinion information if the defendant does not believe the information to be correct. They rely on *Virginia Bankshares, Inc. v. Sandberg*, in which the Supreme Court of the United States considered whether statements of reasons, opinion or belief are actionable under Section 14(a) of the Securities Exchange Act of 1934. *Virginia Bankshares*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). The Supreme Court held that "proof of mere disbelief or belief undisclosed should not suffice for liability under § 14(a)." *Id.*, 501 U.S. at 1096, 111 S.Ct. at 2760, 115 L.Ed.2d at 947.

The Magistrate Judge expressly stated that "the Sixth Circuit has interpreted *[Virginia Bankshares] v. Sandberg* to mean that the opinion is actionable 'if the speaker does not believe the opinion and the opinion is not [factually well grounded.]' " Report and Recommendation (Docket Entry No. 157) at 50 (quoting *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir.1993)).

■ The Court agrees with the Magistrate Judge that the plaintiffs cannot sustain their Rule 10b–5 claims based on these statements. Accordingly, the Court shall affirm the Magistrate Judge's determination with respect to these statements and shall dismiss the plaintiffs' claims based upon them.

■ The Magistrate Judge was also correct in his determination that Columbia's opinion as to whether its business practices were legal is "soft information," and was not required to be disclosed. Accordingly, the plaintiffs' claims as to the defendants' opinion that they were in compliance with the Stark Laws is not actionable and shall be dismissed.

### b. Columbia's 10–Q forms

The remaining statements upon which the plaintiffs base their claims are from Columbia's 10–Q forms. Generally, the plaintiffs assert that these statements misled the public into believing that Columbia's revenue and earnings were based on the defendants' business practices and were legitimate, when in actuality, they were based upon improper practices. The Magistrate Judge recommended that the Court grant the defendants' motion to dismiss with respect to these statements. He found that the defendants did not have a duty to disclose the alleged illegality of their business practices because such information is soft information.

■ However, the plaintiffs are not basing their remaining Rule 10b–5 claims on the fact that the defendants failed to state whether their business practices were legal. Rather, the plaintiffs contend that the defendants were simply required to disclose that the allegedly illegal business practices existed as this is " 'historical information or other factual information that is objectively verifiable.' " *Sofamor Danek*, 123 F.3d at 401 (quoting *Garcia v. Cordova*, 930 F.2d 826, 830 (10th Cir. 1991)). Because the Court must consider all of the plaintiffs' factual allegations admitted on a motion to dismiss, it is immaterial at this point whether the defendants actually engaged in such business prac-

tices. Instead, the question is whether it is substantially likely that the alleged omissions would have been significant to a reasonable investor in his or her decision to invest in Columbia's stock. *In re Craftmatic Sec. Litig.*, 890 F.2d at 639 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, 765 (1976)). There is no question that the basis for Columbia's revenues satisfies this inquiry. Accordingly, the Court finds that the defendants' motion to dismiss must be denied on this ground in the face of the plaintiffs' allegations regarding Columbia's failure to disclose that it engaged in improper business practices.

### 2. Pleading Requirements

#### a. sufficient facts

The defendants contend that the plaintiffs have not satisfied the pleading requirements with respect to the remaining statements concerning the company's business practices because the plaintiffs have provided no facts supporting their contention that the statements were false or misleading. *Id.* at 15. The Magistrate Judge found that the plaintiffs' claims should be dismissed on this basis.

Pleading requirements for fraud are found under Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Moreover, the Sixth Circuit has found that:

> Rule 9(b) requires plaintiffs at a minimum "to allege the time, place and contents of the misrepresentation(s) upon which [they] relied." *Bender v. Southland Corporation*, 749 F.2d 1205, 1216 (6th Cir.1984) (citations omitted). "A

complaint should not be dismissed 'unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Michaels Building Company v. Ameritrust Company, N.A.*, 848 F.2d 674, 679 (6th Cir.1988) (citation omitted). In *Michaels*, this court noted that Rule 9(b) must be read in conjunction with Rule 8, which calls for short, concise statements. *Id.* As such, "the purpose undergirding the particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *Id.*

*American Town Ctr. v. Hall 83 Assoc.*, 912 F.2d 104, 109 (6th Cir.1990).

In addition, under the PSLRA, a plaintiff alleging securities fraud must specify each alleged misstatement and explain the reason it is misleading. 15 U.S.C. § 78u–4(b)(1)(B). When the plaintiff alleges a misstatement or omission based on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." *Id.*[4] In other words, "the law now requires a plaintiff to draw a specific nexus between the allegedly fraudulent statements and the facts upon which the allegation of fraud is dependent, or, at least, a clear statement of why and how the plaintiff has reached the conclusion that a particular statement is fraudulent." *Havenick v. Network Exp., Inc.*, 981 F.Supp. 480, 526 (E.D.Mich.1997). If the plaintiff fails to satisfy this requirement, the Court shall dismiss the plaintiff's complaint on a motion of the defendant to dismiss. *Id.* (citing 15 U.S.C. § 78u–4(b)(3)(A)(if the requirements of § 78u–

---

**4.** The Court notes that allegations based on information and belief generally fail to satisfy the requirements of Rule 9(b). There is an exception to this rule when matters are within the exclusive knowledge of the defendant. *In re Sirrom Capital Corp. Sec. Litig.*, 84 F.Supp.2d at 939.

4(b)(1) are not met, the complaint must be dismissed)).

The defendants contend that the plaintiffs' amended complaint should be dismissed because the plaintiffs did not state with particularity sufficient facts upon which their information and belief that the defendants engaged in improper practices was formed. The plaintiffs argue that their allegations of improper business practices are supported by the fact that three employees of Columbia were indicted for Medicare fraud and other offenses relating to Medicare fraud, the *Wall Street Journal* and *New York Times* published articles reporting the government raids on the Columbia facilities and alleging the possibility of fraud, and the fact that several high-level officers of Columbia resigned during the time of the government investigation. Memorandum in response (Docket Entry No. 96) at 16.

■ Taking the allegations in the amended complaint in the light most favorable to the plaintiffs, the Court finds that the plaintiffs have stated sufficient facts under the PLSRA, 15 U.S.C. § 78u–4(b)(1)(B) and Rule 9(b). Accordingly, the Court will deny the defendants' motions to dismiss on this basis.

### b. scienter

The defendants further aver that the plaintiffs have not satisfied the pleading requirements with respect to the defendants' scienter, and therefore, the plaintiffs' 10b–5 claims should be dismissed under the PSLRA. The PSLRA requires that, "the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If the complaint fails to satisfy this requirement, the Court shall dismiss the plaintiff's com-

plaint on a motion of the defendant to dismiss. 15 U.S.C. § 78u–4(b)(3).

The Magistrate Judge concluded that the defendants' motions to dismiss should be granted because the plaintiffs failed to satisfy the heightened pleading requirements of the PSLRA with respect to the defendants' scienter. In reaching his conclusion, the Magistrate Judge, specifically adopted the opinion of the district court in *In re Comshare Inc., Sec. Litig.*, No. 96–73711–DT, 1997 WL 1091468 (E.D.Mich. Sept.18, 1997), interpreting the scienter requirements of the PSLRA. The Magistrate Judge concluded that " '[i]t is not enough to allege recklessness, or motive and opportunity, in order to establish a defendant's scienter in a securities fraud case,' " but that the " '[p]laintiffs must plead specific facts that create a strong inference of knowing misrepresentation on the part of the defendants.' " Report and Recommendation (Docket Entry No. 157) at 38 (quoting *In re Comshare Inc. Sec. Litig.*, 1997 WL 1091468 at *6).

Since the time the Report and Recommendation was filed, the United States Court of Appeals for the Sixth Circuit reviewed the district court's opinion in *In re Comshare Inc. Securities Litigation*, 183 F.3d at 542. The Sixth Circuit addressed "whether, under the heightened pleading standards set forth in the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b)(2) (1998), a plaintiff alleging securities fraud in violation of the Securities and Exchange Act may survive a motion to dismiss by alleging facts giving rise to a strong inference of recklessness or of motive and opportunity." *Id.* at 545. The Court of Appeals stated "we hold that plaintiffs may meet PSLRA pleading requirements by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive

and opportunity to commit fraud." *Id.* at 551 (citations omitted).

Accordingly, although the Magistrate Judge correctly reviewed the plaintiffs' pleading insofar as he found that pleading "motive and opportunity" alone was insufficient to establish scienter, the determination that evidence of the defendants' recklessness was insufficient has since been overturned. The Court will, therefore, review the plaintiffs' pleadings under the requirement set forth by the Sixth Circuit in *In re Comshare* that the "plaintiffs may continue to survive dismissal by pleading facts that give rise to a 'strong inference of recklessness' of the kind required for securities fraud liability." *In re Comshare Inc. Sec. Litig.,* 183 F.3d at 552–53.

Recklessness, in this context, has been defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1023 n. 19 (6th Cir.1979). Recklessness is "understood as a mental state apart from negligence and akin to conscious disregard." *In re Comshare Inc. Sec. Litig.,* 183 F.3d at 550. It is an " 'extreme departure from the standards of ordinary care[ ] [by omitting information] which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it.' " *United States v. DeSantis,* 134 F.3d 760, 764 (6th Cir.1998) (quoting *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir. 1977)).

The plaintiffs contend that "the Individual Defendants intentionally encouraged or recklessly acquiesced in Columbia's violations of Medicare and Medicade rules and regulations, as well as other federal and state laws, through a variety of illegal mechanisms . . . to increase Columbia's revenues and profits." Amended complaint (Docket Entry 73) at 13. Specifically, the plaintiffs state that the revenues

and earnings from Columbia's hospitals were so much greater than those of other hospitals it was clear that Columbia's revenues and earnings were artificially inflated. They assert that the defendants intentionally and recklessly ignored this red flag.

█ Presuming that the defendants failed to investigate the positive performance of the company, the Court finds that this failure does not constitute a strong inference of recklessness. *See Novak v. Kasaks,* 216 F.3d 300, 309 (2nd Cir.2000)(citing *Chill v. General Elec. Co.,* 101 F.3d 263, 269–70 (2nd Cir.1996) for the proposition that "the failure of a parent company to interpret extraordinary positive performance by its subsidiary—specifically the 'unprecedented and dramatically increasing profitability' of a particular form of trading—as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws"). Accordingly, this assertion does not satisfy the scienter requirement under the PSLRA.

The plaintiffs further assert that, not only did the defendants ignore red flags indicating that Columbia was engaging in illegal methods of raising revenue, the defendants "perpetuated a management philosophy that provided strong incentives for employees throughout the Company to commit fraud." Amended complaint (Docket Entry No. 73) at 13. They assert that the defendants created "a system of cash bonuses—as high as 50% of base pay—to encourage employees to meet annual growth targets. Those targets, set by defendants at 15% to 20%—three times the industry standard of 5%—were far in excess of anything that could be achieved legally." *Id.* The plaintiffs next contend that "Columbia also sent out 'revenue enhancement' teams who were expert in analyzing ways in which hospitals

could improperly employ methods to boost revenues." *Id.* at 15.

■ The Court finds that, even if the defendants aggressively pushed employees to increase company revenues, this does not constitute a strong inference of recklessness. Otherwise, all incentives by corporate management to increase revenue at any company could be construed as reckless and could implicate management in a violation of Rule 10b–5. Accordingly, this assertion does not satisfy the scienter requirement under the PSLRA.

The plaintiffs next contend that the fact that five of the individual defendants disposed of at least 12 million shares of their personally owned stock is evidence that they intentionally caused Columbia's revenues to be inflated so that they would profit more from the sale of Columbia stock. Amended complaint (Docket Entry No. 73) at 28.

■ The Court first notes that insider trading is not considered evidence of fraudulent intent. Rather, it is "a classic example of the 'motive and opportunity' test, which this Court has held no longer suffices to allege scienter in the wake of the PSLRA." *In re Credit Acceptance Corp. Sec. Litig.*, 50 F.Supp.2d 662, 676 (E.D.Mich.1999).

■ Additionally, the Magistrate Judge correctly determined that the plaintiffs' allegations of intent were undermined by the fact that the defendants who did sell portions of their holdings of Columbia stock also retained substantial holdings of the stock. "Many courts have held that the inference of scienter is weak where an officer sells only a small fraction of the shares owned." *Id.* at 677 (citing *Marksman Partners, L.P. v. Chantal Pharm.*, 927 F.Supp. 1297, 1312 (C.D.Cal.1996); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2nd Cir.1995); *Glenayre Tech. Sec.*

*Litig.*, 982 F.Supp. 294, 299 (S.D.N.Y. 1997); and *Havenick*, 981 F.Supp. at 528).

The Magistrate Judge also correctly found that because other defendants retained their holdings, the allegations of insider trading did not give rise to a "strong inference" of intent. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117–19 (9th Cir.1989); *Acito*, 47 F.3d at 54 (citing *In re Cypress Semiconductor Sec. Litig.*, Fed. Sec. L. Rep. (CCH) 20 ¶ 97,060 at 84–697, 1992 WL 294927 (N.D.Cal.1992) for the proposition "that the plaintiffs' claims that defendants artificially inflated the company's share price so that they could sell their stock at a huge profit was underminded by the fact that one of the four defendants did not sell his stock during the class period"); *In re Glenayre Tech. Sec. Litig.*, 982 F.Supp. 294, 299 (S.D.N.Y.1997).

■ The plaintiffs next contend that "the individual defendants had a clear motive to inflate the financial performance of the Company to enhance their compensation." Amended complaint (Docket Entry No. 73) at 28–29. Again, this is not evidence of fraudulent intent as the Court has defined it under the PSLRA, but is evidence of motive and opportunity which does not satisfy the scienter requirement. Furthermore, fraud cannot not be predicated on incentive compensation because if it could, "virtually every company in the United States that experiences a downturn in stock prices could be forced to defend securities fraud actions." *Acito*, 47 F.3d at 54.

■ Finally, the plaintiffs contend that the defendants' use of company stock to make acquisitions during this time is evidence of the defendants' motive to artificially inflate stock prices. Amended complaint (Docket Entry No. 73) at 29. As previously stated, evidence of motive is insufficient to establish scienter under the

PSLRA. Moreover, as the Magistrate Judge appropriately determined, such motivation is insufficient to establish scienter. *See In re Health Mgt., Inc. Sec. Litig.,* 970 F.Supp. 192, 203–04 (E.D.N.Y.1997).

Based on these allegations, the Court finds that the plaintiffs have not alleged a "strong inference" of scienter on the part of the defendants as required to state a cause of action under the PSLRA. Accordingly, on this ground the Court shall grant the motions of the defendants to dismiss Count I of the plaintiffs' amended complaint alleging liability under Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934.

### B. Section 20(a) Claims

As the Court has determined that the plaintiffs' claims under Rule 10b–5 should be dismissed, in accordance with the Report and Recommendation, the plaintiffs claims under Count II of the amended complaint for controlling persons under Section 20(a) of the Securities Exchange Act of 1934 must also fail. *Stavroff v. Meyo,* No. 95–4118, 1997 WL 720475, *6 (6th Cir., Nov.12, 1997); *Jackson Nat'l. Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2nd Cir.1994).

### C. SEC Filings

In Count III of the amended complaint, the plaintiff, Stephen S. Schuster Profit Sharing Plan, alleges that the defendants violated (1) Section 11 of the 1933 Act, 15 U.S.C. § 77k, prohibiting material misstatements or omissions in registration statements filed with the SEC; Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2), prohibiting making a securities offering "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements... not misleading;" and (3) Section 14 of the 1934 Act, 15 U.S.C. § 78n, prohibiting material misstatements or omissions in proxy statements.

The plaintiff alleging these violations received shares of Columbia/HCA stock in exchange for shares of Medical Care of America stock in a merger between Columbia/HCA and Medical Care of America on September 16, 1994. The plaintiff asserts that in connection with the merger, the defendants "caused to be filed" an SEC registration statement, combined with the prospectus and proxy statement, which were provided to Medical Care shareholders. Amended complaint (Docket Entry No. 73) at 35. According to the plaintiff, the filings were materially misleading in that they stated that " 'Columbia was in compliance with the Antifraud Amendments' governing Medicare and Medicade." *Id.*

The Magistrate Judge recommended that the Court grant the defendants' motion to dismiss Count III. First, the Magistrate Judge determined that Messrs. MacNaughton and McWhorter could not be liable for the alleged misrepresentations because they were not members of Columbia's board of directors at the time of the merger in 1994. The Court agrees with that conclusion and will dismiss the plaintiffs' claims against Messrs. MacNaughton and McWhorter under Sections 11 and 12 of the 1933 Act and Section 14 of the 1934 Act.

Next, the Magistrate Judge found that the plaintiffs' claims under Sections 11 and 12 of the 1933 Act failed to satisfy the pleading requirements for a claim of fraud under Rule 9(b) of the Federal Rules of Civil Procedure. The plaintiff objects on the basis that the claims under Sections 11 and 12 are not subject to the pleading requirements of Rule 9(b) because establishing liability under these sections does not require proof of fraud.

The Sixth Circuit has not addressed whether claims under Sections 11 and 12 must be pled with particularity under Rule

9(b). Other courts have reached varying conclusions. A number of courts have found that "when claims alleging material misstatement or omission in a registration statement are grounded in fraud, those claims must state with particularity the circumstances constituting the alleged fraud." *In re Sirrom Capital Corp.*, 84 F.Supp.2d at 938 (citing *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1404–05 (9th Cir.1996); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1115 (W.D.Mich.1996); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3rd Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992)). For instance, the United States Court of Appeals for the Ninth Circuit reasoned that "because the same policy considerations apply to Section 11 claims sounding in fraud, we hold that persons making such claims must state with particularity the circumstances constituting the alleged fraud." *In re Stac Elec. Sec. Litig.*, 89 F.3d at 1405.

In contrast, in cases where the plaintiffs were not alleging fraud in the context of their Section 11 and 12 claims, courts have not required the plaintiffs to comply with the requirements of Rule 9(b). *In re Sirrom Capital Corp Sec. Litig.*, 84 F.Supp.2d at 938. Some courts have gone a step further and stated that, because proof of fraud or mistake is not necessary to sustain a claim under Sections 11 and 12, Rule 9(b) does not apply to those claims. *Id.* (citing *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 594 (E.D.Mich. 1985); *Ross v. Warner*, 480 F.Supp. 268, 273 (S.D.N.Y.1979); *In re NationsMart*, 130 F.3d 309, 314 (8th Cir.1997), *cert. denied*, 524 U.S. 927, 118 S.Ct. 2321, 141 L.Ed.2d 696 (1998)). For example, the United States Court of Appeals for the Eighth Circuit concluded that:

"a pleading standard which requires a party to plead particular facts to support a cause of action that does not include fraud or mistake as an element comports neither with the Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in the Federal Rules of Civil Procedure."

*Id.* at 938, n. 1 (quoting *In re NationsMart*, 130 F.3d at 314). Even if the plaintiffs had alleged fraud in their claims under Sections 11 and 12, such allegations would be stripped from the claims so that "[t]he allegations of innocent or negligent misrepresentation, which are at the heart of [such claims]" would remain. *In re NationsMart*, 130 F.3d at 315.

In Count III, the plaintiff does not allege that the defendants fraudulently made material misstatements or omissions, but that the defendants omitted that they engaged in violations of the Antifraud Amendments. Accordingly, the plaintiffs' claims under Sections 11 and 12 are not grounded upon allegations of fraud. Based on this reasoning, the Court finds that Rule 9(b) is not applicable to the Section 11 and 12 claims and the Court shall deny the defendants' motions to dismiss these claims on the basis that they are not pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure.[5]

In order to state a claim under Sections 11 and 12 of the 1933 Act, and under Section 14 of the 1934 Act, the plaintiff must establish that the statement at issue contained a material omission or misrepresentation that the omission or misrepresentation was material. *See In re NationsMart*, 130 F.3d at 315. The defendants insist that their motion to dismiss with respect to these claims should

---

**5.** Moreover, even if fraud was alleged, as stated by the Court in *NationsMart,* the remedy would be to strip any allegations of fraud from the claim.

be granted because the statement upon which the plaintiffs' claims are based are true in the context from which they were taken. The defendants contend that the statement at issue was taken from the following passage:

> Although Columbia exercises care in an effort to structure its arrangements with physicians to comply in all material respects with these laws, and *although management of Columbia believes that Columbia is in compliance with the Antifraud Amendments, there can be no assurance* that (i) government officials charged with responsibility for enforcing the prohibitions of the Antifraud Amendments will not assert that Columbia or certain transactions in which it is involved are in violation of the Antifraud Amendments and (ii) such statute will ultimately be interpreted by the courts in a manner consistent with Columbia's interpretation.

Memorandum in support (Docket Entry No. 84) at 33. The defendants assert that the statement that management believes Columbia is in compliance was not false and misleading, especially in light of the warnings that the government could find otherwise.

 The Court agrees and finds that the defendants have demonstrated that the plaintiffs can establish no set of facts which will entitle the plaintiffs to relief under Count III of the amended complaint. Accordingly, on this basis, the Court shall grant the defendants' motions to dismiss with respect to these claims.

### III.

The Court has considered the plaintiffs' amended complaint in the light most favorable to the plaintiffs and the Court affirms the conclusion of the Magistrate Judge that the plaintiffs have not sufficiently alleged scienter as required to sustain their Rule 10b–5 claims. Accordingly, Count I

of the amended complaint will be dismissed with prejudice.

The Court further affirms the conclusion of the Magistrate Judge that Count II of the amended complaint alleging violations of Section 20 of the 1934 Act be dismissed.

Finally, the Court affirms the determination of the Magistrate Judge that the statements at issue in Columbia's SEC registration statement cannot be the basis for claims under Sections 11 and 12 of the Securities Act of 1933 and Section 14 of the Securities Exchange Act of 1934 under Count III of the amended complaint. Accordingly, Count III of the amended complaint will be dismissed with prejudice.

Accordingly, the conclusion of the Report and Recommendation shall be adopted as modified and the amended complaint shall be dismissed in its entirety.

An appropriate order shall be entered.

### ORDER

In accordance with the memorandum contemporaneously entered, the Court has independently reviewed the Report and Recommendation of the Magistrate Judge (entered July 1, 1998; Docket Entry No. 157), the plaintiffs' objections (filed July 7, 1998; Docket Entry No. 161), the defendants' responses (filed August 31, 1998; Docket Entry Nos. 165–167) and the entire record. The conclusions of the Report and Recommendation of the Magistrate Judge are adopted and approved as modified. The plaintiffs' objections are sustained in part and overruled in part.

Accordingly, the motion (filed January 9, 1998; Docket Entry No. 90) of defendant Richard L. Scott to dismiss is granted; the motion (filed January 8, 1998; Docket Entry No. 75) of defendant David T. Vanderwater to dismiss is granted; the motion (filed January 8, 1998; Docket Entry No. 83) of defendants Columbia/HCA Health-

care Corporation; Thomas F. Frist, Jr.; R. Clayton McWhorter; Carl E. Reichardt; Magdalena Averhoff; T. Michael Long and Donald S. MacNaughton to dismiss is granted

This action is dismissed with prejudice.

Therefore, the motion (Docket Entry No. 83) of Columbia/HCA Healthcare Corp., Drs. Frist and Averhoff and Messrs. McWhorter, Reichardt, Long and McNaughton to strike is denied as moot. The plaintiffs' motions for class certification (filed February 11, 1998; Docket Entry No. 102) for class certification, to ascertain status of the case (filed February 3, 1999; Docket Entry No. 175), and for case management conference (filed May 25, 1999; Docket Entry No. 177) are moot.

The plaintiffs' motion for judicial notice (filed July 26, 1999; Docket Entry No. 184) is denied pursuant to Federal Rule of Evidence 201. The plaintiffs' motion for oral argument (filed July 2, 1998; Docket Entry No. 158) is denied. The defendants' motion to take judicial notice (filed January 8, 1998; Docket Entry No. 86) is granted.

Entry of this order shall constitute the judgment in this action.

It is so ORDERED.

## ORDER

The Court has before it the plaintiffs' motion (filed August 10, 2000; Docket Entry No. 193) to alter or amend the judgment and for leave to file an amended complaint; memorandum (Docket Entry No. 194) in support and request (Docket Entry No. 195) for oral argument; the responses (filed September 6, 2000; Docket Entry No. 197) of the defendants, Columbia/HCA Healthcare Corporation and the outside directors and the defendants, Mr. Scott (Docket Entry No. 198) and Mr. Vandewater (Docket Entry No. 199) in opposition to the plaintiffs' motion. The Court also has before it the plaintiffs' reply memorandum (Docket Entry No. 202) filed September 18, 2000, and the defendants' sur-reply (Docket Entry No. 205) filed October 4, 2000.

Having carefully considered the submissions of the parties, the Court is satisfied that its original disposition of this matter as reflected in the memorandum (Docket Entry No. 191) and order/judgment (Docket Entry No. 192) entered July 28, 2000, was correct. The plaintiffs have failed to demonstrate an acceptable and legitimate reason to alter or amend the judgment in this action. *GenCorp, Inc. v. American Intern. Underwriters*, 178 F.3d 804, 834 (6th Cir.1999).

The Court had this matter under advisement for a considerable period of time while it sifted through the extensive briefing on the objections to the Magistrate Judge's Report and Recommendation. It is true that the plaintiffs submitted various requests for the Court to take judicial notice of first one and then another assertion. However, at no point in time prior to judgment did the plaintiffs ever seek to amend and file a *second* consolidated amended class action complaint. The course of action the plaintiffs elected to follow was a strategic decision[1] of their own choice. It appears to have had about it a bit of the cat and mouse, i.e., let the Court first sort out the deficiencies in the pleadings and after judgment then seek to amend to patch up the matter and attempt to close the rat holes. The plaintiffs had every opportunity to amend during the

---

1. The plaintiffs' suggestion that they relied on the Magistrate Judge's recommendation of dismissal without prejudice to re-file upon disclosing more specific facts was just that—a recommendation and nothing more. The suggestion that it constituted the law of the case (plaintiff's memorandum, Docket Entry No. 202 at 6) is misplaced.

pendency of this matter and must accept the consequences of their delay.

Accordingly, the plaintiffs' motion (Docket Entry No. 193) to alter or amend the judgment and for leave to file a second consolidated amended complaint is denied.

The request (Docket Entry No. 195) for oral argument is likewise denied.

It is so ORDERED.

## REPORT AND RECOMMENDATION

HAYNES, United States Magistrate Judge.

## I. INTRODUCTION

This civil action was referred to the Magistrate Judge by the Honorable Thomas A. Higgins, District Judge, by Order entered February 11, 1998. The Magistrate Judge was directed to prepare proposed findings of facts and recommendations for disposition of the following motions:

1. Defendant Vandewater's motion to dismiss (Docket Entry No. 75);
2. The defendants', Columbia/HCA Healthcare Corporation, Thomas F. Frist, Jr., R. Clayton McWhorter, Carl E. Reichardt, Magdalena Averhoff, T. Michael Long and Donald S. MacNaughton, motion to dismiss and to strike (Docket Entry No. 83);
3. The defendants', Columbia/HCA Healthcare Corporation, Thomas F. Frist, Jr., R. Clayton McWhorter, Carl E. Reichhardt, Magdalena Averhoff, T. Michael Long and Donald S. MacNaughton, motion to take judicial notice of exhibits submitted in connection with their motion to dismiss and strike (Docket Entry No. 86);

4. The defendants' motion (filed January 8, 1998; Docket Entry No. 89) for oral argument; and
5. Defendant Richard L. Scott's motion to dismiss (Docket Entry No. 90).

By agreement of the parties, oral argument in this action and in *McCall v. Scott,* No. 3:97-0138 was held on March 26, 1998 (Docket Entry No. 63). The parties in this action also submitted post-hearing briefs (Docket Entry Nos. 137 and 138), and the plaintiffs later filed a motion for judicial notice (Docket Entry No. 131).

Plaintiffs [1] filed this class action under Sections 10(b), 14, and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), codified at 15 U.S.C. §§ 78j(b), 78n, and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (the "SEC") at 17 C.F.R. §§ 240.10b-5; as well as Sections 11 and 12(b)(2) of the Securities Act of 1933, codified at 15 U.S.C. §§ 77k and 77l(b)(2). The Court's jurisdiction arises under § 22 of the 1993 Act, 15 U.S.C. § 77(v) and § 27 of the 1934 Act, 15 U.S.C. § 78aa. Plaintiffs, owners of the common stock of defendant Columbia/HCA Healthcare Corporation filed this securities action against defendants: Columbia/HCA Healthcare Corporation, and the following individual defendants, each of whom are or were directors and/or officers of Columbia: Thomas F. Frist, Jr., Richard Scott, David Vandewater, R. Clayton McWhorter, T. Michael Long, and Donald S. MacNaughton. Plaintiffs' class consists of all persons or entities who acquired Columbia's common stock from April 9, 1994 to September 9, 1997 (the "Class Period").

---

1. Sidney Morse, Lisa Liotta, Bernice Mermelstein, IRA, Bert Skolsky, Leon Cohen, Lois Pepperman, Phyllis Edwards, Andrew Asher, ZSA Asset Allocation Fund, Robert Meyers, Kevin Shea, Herbert Tyson, Selma Molder, Phyllis Beiro, Murray Sultan and Lillian A. Sultan, Co-Trustees, Carol Spies, Susan Enholm, Michael S. Duga, and Stephen S. Schuster, Profit Sharing Plan, Kent E. Mason, IRA SEP, Dirk Berger, Laborers Tri-County Pension Fund, and Carol Ravenal.

In sum, plaintiffs' securities claims are that Columbia's public statements and SEC filings have consistently created a false and misleading impression about its compliance with federal and state laws applicable to its operations. According to plaintiffs, Columbia has actually engaged in illegal billing and reporting of medical treatments and services at its hospitals, home health care and other facilities in violation of the federal medicare and medicaid laws. As a result, Columbia's reported revenues, earnings, and stock prices allegedly were artificially and materially inflated. Therefore, Columbia's corporate reports, public filings and statements gave misleading information to purchasers of Columbia stock. As described in more detail *infra*, these unlawful practices included: upcoding of patients' illnesses; inflating cost reports; improperly shifting payments of Columbia's corporate overhead to Medicare and other government-sponsored programs; impermissibly seeking reimbursements from those programs for acquisitions of hospitals and other health care facilities, including home health care facilities; "unbundling" groups of laboratory tests for separate charges where one flat rate should have been charged; and referring its hospital patients to its home health care facilities so as to increase unlawfully its reimbursements from the government.

As to the individual defendants, plaintiffs contend that as Columbia's officers and directors, the individual defendants breached their duties to disseminate timely, accurate, and complete information about Columbia's business operations, financial condition, performance, and future prospects, because such matters materially affect the market price of Columbia's stock. Further, the defendants are alleged to have breached their duties to stockholders by engaging in insider trading and failing to monitor the corporation's practices to detect and avoid such illegal practices.

In earlier proceedings, the Court ordered that the plaintiffs' stockholder derivative claims be consolidated and transferred to a related action, *McCall v. Scott*, 3:97–0838 (Docket Entry No.18, Order at p. 4). In addition, pursuant to the Private Securities Litigation Reform Act (PSLRA),[2] the Court appointed lead and liaison counsel for each action. *Id.* Lead counsel in this action was directed to file an amended complaint with only federal securities claims.[3]

In their motion to dismiss, Columbia and individual defendants argue, in sum: (1) that the amended complaint does not meet the specific factual pleading requirements of the PLSRA, Fed.R.Civ.P 9(b), or prior decisional law under the Securities Acts; (2) that under a recent Sixth Circuit decision, the defendants did not owe a legal duty to disclose its business practices or any opinions about Columbia's business practices; (3) that the amended compliant fails to state which statements are false or misleading; (4) that the amended complaint fails to inform the outside directors of their individual participation in the alleged scheme of unlawful conduct; (5) that plaintiffs' reliance on the group pleading doctrine is unjustified without a showing of unlawful conduct or a defendant's involvement in the unlawful conduct; (6) plaintiffs' factual allegations do not show that the directors acted with scienter or reck-

---

2. Pub.L.No. 104–67, 109 stat. 737 that is now codified at 15 U.S.C. §§ 77 and 78.

3. Plaintiffs note the Court directed these claims to be succinctly stated, but the Court did allow the amended complaint to be forty pages in length. See Transcript of August 15, 1997 case management conference. Fed. R.Civ.P. 8 requires a plain and short statement, but fraud claims require particularized pleading. Fed.R.Civ.P.9(b).

less intent necessary for securities claims under the PSLRA or prior decisional law; (7) that none of the cited individual defendants was a controlling person for a Section 20(a) claim, and (8) that the factual allegations for plaintiffs' claims under Sections 11, 12(a) and 14 do not show any violation.

The motions of defendants Scott and Vandewater essentially adopt these contentions (Docket Entry Nos. 75 and 90). Vandewater notes that he was not a signatory to any SEC documents (Docket Entry No. 75, Vandewater Motion at ¶ 3). Scott also contends that without a valid Rule 10b-5 claim, plaintiffs cannot sustain a claim under Section 20(a) of the 1934 Act (Docket Entry No. 90, Scott Motion at ¶ 4).

In response, plaintiffs argue that the federal criminal investigation of Columbia with its issuance of target letters, search warrants and the indictment of three corporate officials presents sufficient facts of Columbia's systemic fraud in its participation in federal medical care programs (Docket Entry No. 96, Plaintiffs' Memorandum at pp. 2–3). This fraud includes Columbia's marketing practices that are set forth in plaintiffs' amended complaint. *Id.* at pp. 3–4. Those fraudulent acts rendered the statements in Columbia's SEC and public statements about its revenues false and misleading, thereby causing artificially high prices for Columbia's stock and effecting a fraud on the market. *Id.* Plaintiffs also allege that the defendants' 10–K reports that the government inquiry regarding Columbia's billing practices would not have a material adverse financial impact, was a false statement. *Id.* at p. 10.

Plaintiffs also rely upon their factual allegations regarding Columbia's marketing practices to provide the requisite factual specificity under the PSLRA, which merely codifies prior decisional law that the amended complaint satisfies. *Id.* at 14. Plaintiffs further contend that under the "group publication doctrine," the individual directors can be held liable for documents that they signed, where such documents contained false and/or misleading statements. Finally, plaintiffs contend that the defendants Frist, McWhorter, Long and MacNaughton, who served on Columbia's Executive and/or Audit Committee, were controlling persons or had a special relationship with Columbia so as to impute to them the violations of Medicare laws by others as well as the alleged false statements in Columbia's documents. Further, these defendants recklessly failed to be informed about Columbia's illegal marketing practices. *Id.* at pp. 20–25.

For the reasons set forth below, the Magistrate Judge concludes that the defendants' motions to dismiss should be granted. First, the plaintiffs' allegations do not satisfy the heightened pleading requirements of the PSLRA or Fed. R.Civ.9(b). Under the applicable law, plaintiffs' allegations do not contain specific facts of the individual defendants' involvement in the alleged illegal billing and reporting nor allegations of specific facts giving rise to a strong inference of a company-wide practice of knowing misrepresentations by the defendants. Second, the predicates for the defendants' liability are their failures to disclose their business practices in their public filings. Under binding Sixth Circuit precedent, such failures to disclose are not actionable. Without a duty to disclose such practices, Columbia's public filings were neither false nor misleading. Third, to the extent legal opinions were expressed about the company's practices, such opinions involve soft information that cannot be the basis for a false or misleading statement under the federal securities laws. The cited corporate statements about the impact of the government inquiry was based upon historical data and is not actionable under the federal securities laws. Without a predi-

cate rule 10b–5 liability, the individual defendants cannot be controlling persons under section 20(a) of the 1934 Act.

## II. ANALYSIS OF THE AMENDED COMPLAINT [4]

### A. Factual Allegations

#### 1. Columbia's Market

According to the amended complaint, Columbia is one of the leading providers of health care services in the United States and operates over 340 hospitals, 150 outpatient surgery centers and over 570 home health care centers in 36 states and abroad (Docket Entry No. 73, Amended Complaint at ¶ 10). By 1995, Columbia owned and operated 45% of all for-profit hospitals in the United States. *Id.* Columbia was approximately three times the size of the second largest for-profit hospital management company in the country. *Id.* Columbia is the nation's ninth largest employer with 285,000 employees. *Id.*

Columbia obtains significant revenues from the Medicare, Medicaid and CHAMPUS programs of the federal government. *Id.* at ¶¶ 21, 22 and 23. Medicare is a federally funded health insurance program that provides certain hospital and medical insurance benefits to persons 65 years of age and older, and to the disabled. *Id.* at ¶ 21. Medicare payments to health care providers fall under one of two parts: Part A, the Basic Plan of hospital insurance that covers the cost of hospital services and related care, *Id.* at ¶ 23; or Part B which covers the costs of physicians' services and numerous medical services that are not covered by Part A. *Id.* Medicaid is a federal-state program that the states administer to provide hospital benefits to qualifying individuals. *Id.* CHAMPUS is a health care program that is administered

by the Department of Defense for dependents of military personnel. *Id.* From 1994 to 1996, Columbia received over 40% of its revenues from Medicare and Medicaid. *Id.* at ¶ 22. Medicare paid Columbia approximately $8 billion and Medicare paid about $1.2 billion for treatment of patients under that program. *Id.* Columbia is Medicare's single largest biller. *Id.*

For billing under these programs, the Health Care Finance Administration ("HCFA"), an agency established in the Department of Health and Human Services ("DHHS"), processes payments under Medicare Part A, Medicaid and CHAMPUS programs. *Id.* at ¶ 23. Medicare has a "Prospective Payment System" (PPS) under which hospitals file an initial or "as filed" cost report that Medicare utilizes to calculate a hospital's reimbursement. *Id.* at ¶ 25. A final settlement in the amount of the "as filed" cost report does not occur until an audit of the cost report is performed and the audit "often occurs several years later." *Id.* Columbia's cost reports submitted to the federal and state governments exceeded $9 billion annually during the Class Period. *Id.*

For actual payments under these programs, HCFA makes interim cost-based payments to Columbia facilities for the fiscal year based upon the type of services provided to eligible patients admitted or treated by these facilities and Columbia's "cost report" for the preceding year. *Id.* at ¶ 23. Payments for specific diagnoses are based upon the approximately 500 diagnostic related groups ("DRGs") that are the standardized codes for specific diagnoses, medical procedures, and treatments. *Id.* In contrast, for services and expenses directly related to care for Medicare patients, Medicare Part B reimburses hospi-

---

**4.** Unlike *McCall,* the plaintiffs' securities claims are based upon federal law and the federal rule that the amended complaint su-

persedes the original complaint obtains here. *Clark v. Tarrant County,* 798 F.2d 736, 740–41 (5th Cir.1986).

tals, hospitals with affiliated home health care agencies ("HHAs") and free standing HHAs (those not directly affiliated with a hospital) on an actual cost basis with a ceiling. *Id.* at ¶ 24.

## 2. The Federal Investigation

Beginning in September 1996 and continuing to the present date, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), the Department of Defense ("DOD"), the Office of the Inspector General of the Department of the HHS, and the United States Attorney's Office for the Middle District of Florida have been conducting a criminal investigation of Columbia's billing practices. *Id.* at ¶ 26. On March 19, 1997, a federal search warrant was issued for various records of Columbia's El Paso, Texas offices. *Id.*[5]

On March 19, 1997, after the close of trading of the New York Stock Exchange, Columbia issued a press release on the El Paso search warrants. *Id.* at ¶ 65. Columbia maintained that the federal investigation was limited to its El Paso facilities. *Id.* According to this press release, Columbia was unaware of the reason for the warrant. *Id.* On March 20, 1997, *The New York Times* reported that the search warrants were the result of an investigation by the FBI, IRS, HHS, the Department of Justice, and the DOD. *Id.* On March 21, 1997, *Bloombere Business News* reported that Columbia spokesman Jim Prescott stated, "We still think this is confined to El Paso." *Id.* at ¶ 67.

After the El Paso searches on March 21st, Columbia's stock declined to a price of $38.50 per share, that was almost 10% lower than its closing price prior to the search warrant and the disclosures of March 19th and 20th. *Id.* at ¶ 68. On

March 27, 1997, Columbia filed with the SEC its Form 10–K for its 1996 fiscal year, signed by the Individual Defendants (except Vandewater), but the defendants "provided no *additional* information concerning the federal investigations". *Id.* at ¶ 69. (Emphasis added). In this 10–K report, defendants stated that the "amounts received under Medicare and Medicaid programs are significantly less than the hospital's customary charges for the services provided." *Id.* at ¶ 69. On April 15, 1997, Scott announced a $1 billion stock repurchase program by Columbia subject to market conditions. *Id.* at ¶ 70.

In July 1997, FBI Special Agent Joseph L. Ford signed an affidavit, filed in the United States District Court for the Middle District of Florida, for search warrants for relevant documents and other tangible items at various Columbia facilities in several states. *Id.* at ¶ 27. In paragraph 4 of his affidavit, Ford stated that the federal government had "uncovered a *systemic corporate scheme perpetrated by corporate officers and managers of Columbia's hospitals, HHAS, and other facilities* in the State of Tennessee, Florida, Georgia, Texas and elsewhere *to defraud Medicare, Medicaid and CHAMPUS.*" *Id.* (Emphasis added.) Paragraph 5 of Ford's affidavit stated that the criminal investigation of Columbia is ongoing and included allegations of fraud by "Columbia corporate officials in Tennessee". *Id.* On July 16, 1997, search warrants were executed at approximately 35 Columbia locations in six states. *Id.*

A federal grand jury in the Middle District of Florida indicted three of Columbia's employees for Medicare fraud and other crimes related to the overbilling of Medicare. *Id.* at ¶ 29. One of these per-

---

**5.** Plaintiffs note that later in or about August 1997, government agents discovered Columbia documents in a garbage dumpster near a

gas station in El Paso, Texas, several miles from the nearest Columbia facility. *Id.* at ¶ 80.

sons was a Director of Reimbursement for non-division Columbia hospitals whose office was at Columbia's headquarters in Nashville. *Id.*

In addition, grand juries in several states are also investigating Columbia for possible Medicaid fraud. *Id.* at ¶ 28. Plaintiffs allege that Columbia is a "target" of a federal criminal investigation that the plaintiffs contend the government intends to prosecute. *Id.* at ¶ 2. Various news organizations, including *The Wall Street Journal* and *The New York Times,* have reported about Columbia's billing practices.

Numerous high ranking officers at Columbia have resigned since the Government's investigation, including: defendants Scott and Vandewater; Steven T. Braun, Senior Vice President and General Counsel; Samuel A. Greco, Senior Vice President of Operations and Finance; Jamie P. Hopping, President, Western Region; Lindy B. Richardson, Senior Vice President, Marketing and Public Affairs; and Herbert G. Wong, Senior Vice President. *Id.* at ¶ 29.

On September 9, 1997, Columbia announced that the federal investigation "would negatively impact Columbia's profits" and that for the third quarter ending September 30, 1997, Columbia had expended $60 million in expenses related to severance costs and ongoing government investigations. *Id.* at ¶ 72. Columbia's management projected that revenues would be down compared to its third quarter of 1996 and announced a reduction in earnings per share from $.25 to $.20, compared with $.46 per share in last year's third quarter. *Id.* Analysts had predicted earnings of $.52 per share. *Id.* After the announcement, Columbia stock fell to $29.625 per share. *Id.*

Because Columbia receives 40% of its revenues from Medicare, Medicaid, and CHAMPUS, and because the market price for Columbia's stock dropped after the publication of news articles on Columbia's billing practices, plaintiffs contend that Columbia's 10–K statement about the government inquiry not having a material impact on its revenues was false. *Id.* at ¶ 42.

### 3. Columbia's Alleged Fraudulent Practices

#### a. Employee Compensation Package

According to the plaintiffs, Columbia had "a management philosophy that provided strong incentives for employees throughout the Company to commit fraud." *Id.* at ¶ 30. Plaintiffs cite Columbia's system of cash bonuses to employees of up to 50% of base pay, "to encourage employees to meet annual growth targets" of 15% to 20%. *Id.* Such targets were allegedly three times the industry standard. *Id.* The other allegations about this compensation system are in the analysis of plaintiffs' allegations of scienter, discussed *infra* at pp. 26–28.

#### b. Upcoding

Columbia's alleged practice of "upcoding" involves the use of the DRG codes for illnesses under which serious illnesses are reimbursed at higher rates. *Id.* at ¶ 51. A case mix index ("CMI") reflects the "mix" of DRGs for which a hospital seeks reimbursement. *Id.* The federal government calculates a CMI annually for each acute care hospital in the Medicare program. *Id.* A high CMI reflects more billings for complex treatments. *Id.*

Plaintiff alleged that in 1996, HCFA reviewed the records of one of Columbia's hospitals, Columbia Spring View Medical Center ("Spring View") in Kentucky and found its bills to be "skewed" toward the highest-paying codes. *Id.* at ¶ 32. In 1995, Spring View billed for treating 191 cases of "complex respiratory infection," but only 10 cases of the lower-paying "pneumonia with complications." *Id.* In

contrast, four nearby hospitals billed more than twice as many cases of pneumonia with complications as compared to the complex respiratory infection—263 to 117. *Id.* At Spring View, Medicare paid approximately $5,700 for treatment of a complex respiratory infection, as compared to $1,700 or more for pneumonia with complications. *Id.*

Plaintiffs also cite a March 28, 1997 *New York Times* article that analyzed hospital records from Texas and Florida, the two states with the highest concentration of Columbia hospitals. *Id.* at ¶ 33. The analysis revealed that in 1995, five Columbia general-care hospitals in Texas ranked highest in that state for the proportion of cases billed at the highest-paying of the four respiratory codes. *Id.* In Florida, the top six billers were Columbia hospitals. *Id.* At the Cedars, a Florida hospital, 93% of the respiratory cases were in the category with the four highest-paying codes. *Id.* at ¶ 34. At the county hospital across the street, Jackson Memorial, only 28% of the billings were for those codes. *Id.* Cedars billed for 355 cases of complex respiratory infection and only 28 cases of the three lower-paying diagnoses. *Id.* According to the *Times* article, Cedars did not bill a single case of the lowest-paying illness, "simple pneumonia". *Id.* A complex respiratory infection garnered a Medicare reimbursement of $6,800 while a reimbursement for simple pneumonia was $3,150. In 1992, before its acquisition by Columbia, Cedars billed only 31% of respiratory cases in the highest code. *Id.* A year later those billings increased to 76%. *Id.* In 1995, Cedars billed 90% of its respiratory cases in the top code. *Id.*

According to the *New York Times'* articles, in 29 of 31 states in which Columbia operated acute care hospitals in 1996, Columbia's hospitals average CMI exceeded the statewide average. *Id.* at ¶ 35. Columbia had "revenue enhancement" teams from its Nashville headquarters that were sent to Columbia hospitals to analyze ways in which their hospitals could boost revenues. *Id.*

Columbia allegedly improperly billed millions of dollars for unnecessary medical services under Medicare Part B. *Id.* at ¶ 49. Patients under Medicare Part B claims must pay the portion Medicare does not either from personal resources or by Medicare "gap" insurance that pays the patient's portion of such uncovered billings. *Id.* This alleged practice is described as an integral part of defendants' scheme to inflate Columbia's revenues and profits improperly and illegally. *Id.*

### c. False Cost Reports

As a by-product of its upcoding, plaintiffs allege that Columbia also filed false costs reports for reimbursements from federal and state governments, private insurance companies, and individual patients. *Id.* at ¶ 36. "As a corporate practice," Columbia hospitals maintain a second set of cost reports and work papers that are called "reserve cost reports". *Id.* at ¶ 37. These "reserve costs reports" contain lower amounts for Columbia billings than in Columbia's reports filed in the HCFA. *Id.* A "reserve costs report" is a generally accepted accounting practice in the healthcare industry for "grey areas" that are subject to dispute. *Id.* Columbia's "reserve" reports are alleged to exceed materially the industry norm for such reports. *Id.* According to the plaintiffs, these reports contain "to the dollar" the known nonallowable expenses included in Columbia's "as filed" costs reports. *Id.* Columbia set aside funds to repay Medicare for nonallowable overcharges in its "as filed" cost reports. *Id.* Plaintiffs allege, however, that Columbia did not schedule for HCFA the items in the so-called "grey area". *Id.* This failure to file the proper schedule of "grey area" items allegedly

was done to conceal them improperly and to obtain greater reimbursement from HCFA. *Id.*

#### d. Unbundling

Plaintiffs also contend that Columbia "routinely" overcharged the Government and private insurers for laboratory tests by "unbundling" them. *Id.* at ¶ 57. Hospitals usually bill for laboratory tests in groups, with a flat fee charged for several different tests. *Id.* To increase its revenue, Columbia routinely charged for each separate laboratory test that plaintiffs contend should otherwise have been included within a flat fee.

#### e. Illegal Cost Shifting

Columbia hospitals' "as filed" costs reports with HCFA allegedly contained costs for overhead, or administrative and general matters that are not subject to reimbursement. *Id.* at ¶ 50. Plaintiffs cite Fawcett Memorial, a Columbia hospital, as improperly shifting administrative and general expenses to capital expenses to obtain greater reimbursement from HCFA. Officials in Columbia's Nashville headquarters transferred approximately $800,000 in interest expenses to Columbia's Gulf Coast Hospital in Fort Myers, Florida in 1994 or 1995. This amount allegedly had no connection to the Gulf Coast Hospital, but was reported as capitalized interest on the construction of the Gulf Coast hospital. *Id.* Informants have told the government that this entry was fictitious causing HCFA to over-pay Gulf Coast.

Plaintiffs also allege that Columbia improperly shifted costs from Medicare Part A to Medicare Part B to obtain reimbursements for non-reimbursable expenditures at actual cost. Under Medicare Part B, the government reimburses, with some limitations, the amount of a hospital's submitted claims. *Id.* at ¶ 44. According to the plaintiffs, Columbia illegally shifted its costs of hospital patients (either physically or on the hospitals' books), from Medicare Part A to cost centers such as a comprehensive outpatient rehabilitation center or a home health agency (HHA) that is paid at a higher amount or actual cost under Medicare Part B. *Id.* at ¶ 45. In a word, Columbia was paid dollar-for-dollar under Medicare Part B, but the billings for these patients should have been at a lower fixed rate under Medicare Part A. *Id.* The extent and number of such instances are not provided, but "[i]nformants in the government's investigation, who include former employees of Columbia, are reported to have recorded conversations about this improper cost-shifting." *Id.*

Due to this cost shifting practice, plaintiffs contend that statements in Columbia's 10–K forms during the Class Period that facilities such as a HHA was an integral component of the Company's strategy to develop a comprehensive health care network in each of its target markets, also were false. *Id.* at ¶¶ 46 and 47. According to the plaintiffs,

> these statements about Columbia's facilities failed to disclose that within these hospitals and outpatient facilities, defendants caused Columbia to categorize patients into a complex of pigeon holes so as to unlawfully maximize reimbursement from HCFA, thereby artificially and materially inflating Columbia's revenues and earnings.

*Id.* at ¶ 47.

#### f. Improper Reimbursement of Acquisition Costs

Plaintiffs next allege that the federal government is investigating whether (either through the parent company or subsidiary) Columbia improperly sought reimbursement of expenses incurred as a result of Columbia's acquisitions of hospitals or other health care subsidiaries. *Id.* at ¶ 48. Columbia hospitals in at least four states

improperly filed for Government reimbursement of their costs incurred in recruiting doctors. *Id.* Plaintiffs cite an August 27, 1997 *Wall Street Journal* article stating that the government has evidence that Columbia billed for costs related to its operation of gift shops and cafeterias. *Id.*

According to the *Wall Street Journal* article, the government is examining whether Columbia sought reimbursement for expenses in transactions with its subsidiaries or affiliates. *Id.* at ¶ 51. Under Medicare regulations, hospitals must disclose related-party transactions to auditors and other fiscal intermediaries who review Medicare cost reports. *Id.*

For particulars, plaintiffs allege that government investigators are examining Columbia's 1994 acquisition of Olsten Health Management ("Olsten Health"), a subsidiary of Olsten Corporation ("Olsten"). *Id.* at ¶ 52. In 1994, Olsten sold 22 home-health agencies in Florida for an undisclosed price. *Id.* Yet, under the acquisition contract, Olsten continued to manage the home health care agencies on Columbia's behalf and managed Columbia's home health care agencies that were opened after the acquisition. *Id.* Olsten now manages approximately 150 of Columbia's approximately 570 home health care agencies. *Id.* According to plaintiffs, "[p]rosecutors are investigating whether Columbia paid Olsten a reduced purchase price, and has subsequently been paying Olsten an inflated management fee, for which Columbia is reimbursed by HCFA, thus using federal funds to subsidize Columbia's purchase of Olsten Health." *Id.*

During the Class Period, the plaintiffs contend that Columbia initiated an aggressive acquisition policy using inflated Columbia common stock as currency. *Id.* at ¶ 76. For particulars, on September 16, 1994, Columbia merged with Medical Care of America ("Medical Care"). *Id.* Under the merger agreement, Medical Care

stockholders received shares of Columbia common stock in exchange for Medical Care stock. *Id.* Similarly, Columbia acquired HealthTrust on April 24, 1995 for shares of its common stock. In addition to the acquired companies, Columbia's use of its stock to acquire companies artificially inflated the price of Columbia's stock. Thus, Columbia had a strong incentive to inflate the price of its common stock so as to achieve a favorable exchange ratio for acquisitions. *Id.*

### h. Improper Recruitment of Physicians and Administrators

Plaintiffs allege that a jury found that Columbia conspired with a physician, Dr. Ambrose Aboud, to defraud radiation oncologist Dr. Lee Schlichtemeier, Dr. Aboud's partner, out of Dr. Schlichtemeier's interest in his oncology partnership with Dr. Aboud. *Id.* at ¶ 55. The jury found that Columbia paid Dr. Aboud $152,000 for undocumented or non-existent outstanding expenses, in violation of Medicare standards as well as an additional $120,000 for used medical equipment. *Id.* Columbia promised Dr. Aboud one-half of the practice, if Dr. Aboud disassociated with Dr. Schlichtemeier. *Id.* The evidence at trial included a tape of a telephone conversation between Dr. Aboud and Russ Schneider, then president of Columbia's southwest division on this project. *Id.* In addition, a letter from Vandewater and signed by Scott set out the terms of the agreement. *Id.* The jury awarded Dr. Schlichtemeier $6.2 million, including $5 million in punitive damages. *Id.*

In their negotiations for the purchase of a South Miami Hospital, "Columbia personnel", including Scott, allegedly advised South Miami's administrator (John Geanes) that if the acquisition were consummated, he could remain at South Miami at an increased salary. *Id.* at ¶ 53. Geanes told Scott that he resented this offer and

was leaving Florida to return to South Carolina. *Id.* A few days later, an unidentified Columbia employee advised Geanes that a job was open for him in South Carolina. *Id.* Geanes later discussed with unidentified Columbia personnel opening a cardiac center and Vandewater told Geanes that Columbia could funnel patients to the center. *Id.* at ¶ 54. When Geanes was skeptical about such referrals, Vandewater assured Geanes that Columbia's doctors were also Columbia stockholders and therefore were under Columbia's control. *Id.*

In addition, Columbia frequently recruits foreign doctors by obtaining visas under the false pretense that such doctors will work in under-privileged areas, but allegedly, Columbia places such doctors in for-profit hospitals. *Id.* at ¶ 56. Internal Columbia documents were sent anonymously to the press and to the FBI describing this arrangement. *Id.* Columbia purportedly did not dispute the documents' authenticity. *Id.*

### i. Stark Violations

The Social Security Act has kickback provisions, commonly known as "Stark I" and "Stark II" that, subject to certain exceptions, prohibit referrals of Medicare and Medicaid patients to clinical laboratories, physical and occupational therapy services, radiology services(durable medical equipment), and home health and hospital services, with which a referring physician has a financial relationship. *Id.* at ¶ 58. Both *Stark I* and *Stark II* provide for civil penalties and debarment from the Medicare and Medicaid programs. *Id.*

Plaintiffs allege that Columbia violated these provisions by: offering referring physicians equity interests in Columbia's health care operations, other than hospitals, through partnership or corporate structure arrangements; extending loans or helping the physicians obtain loans for these investments; and encouraging those physicians who invested to make referrals to the Columbia facilities in which they had invested. *Id.* at ¶ 58a. Columbia allegedly used "directorship" or "consultation" fees to physicians to induce their referrals of patients to Columbia hospitals. *Id.* at 58b. Columbia also provided physicians, and others in positions to refer patients, with guaranteed income, free or reduced-rate rent, free or reduced-cost medical training opportunities, free or reduced-rate vacations, hunting and fishing trips, and other recreational activities. *Id.* Columbia purportedly tied salaries, bonuses, promotions, and employment relationships to the amount of business provided to its hospitals and affiliated facilities. *Id.*

Columbia also employed individuals whose sole job responsibility was to increase self-referrals from Columbia hospitals to Columbia's home health care division. *Id.* at ¶ 59. Medicare patients represent approximately one-third of Columbia's home health care services. To maximize its Medicare reimbursements, Columbia's discharge planners were to ensure that Medicare patients remained at Columbia hospitals for as long as Medicare coverage lasted, and no longer. *Id.* Privately insured patients were kept as long as possible. *Id.* Virginia Rutledge, a discharge planner, sued Columbia for her wrongful termination after she became a "whistle-blower" alleging that: (1) Columbia improperly used discharge planners to determine the length of hospital stay; and (2) Vandewater and others at Columbia's headquarters were fully aware of the improper using of discharge planners. *Id.* at ¶ 60.

### j. False and Misleading Public Statements

Plaintiffs allege that the individual defendants "caused Columbia to issue and disseminate various misleading statements and documents to the investing public the

purpose and effect of which was to lull the public into a belief that the business of Columbia was thriving as a result of legitimate and fair business practices, despite the fact that the opposite was true." *Id.* at ¶ 38. "These misleading financial statements were inaccurate and inflated because Columbia had over billed HCFA, the states, the DOD, private insurers and private individuals who had paid for treatment." *Id.* at ¶ 39.

For particulars, plaintiffs cite an excerpt from Columbia's Forms 10–K sometime during the Class Period (April 9, 1994 to September 9, 1997) that stated:

> The Social Security Act ... imposes criminal and civil penalties for making false claims to Medicare and Medicaid for services not rendered or for misrepresenting actual services rendered in order to obtain higher reimbursement. Like the Antifraud Amendments, this statute is very broad. Careful and accurate coding of claims for reimbursement must be performed to avoid liability under the false claims statutes.
>
> *The OIG [Office of the Inspector General] has requested information regarding the Company's procedures for preparing Medicare cost reports. The Company is cooperating fully with the OIG and has provided various information in order to explain the Company's practices. Management believes that any claims in this regard, if asserted, would not have a material adverse effect on the Company's financial position or results of operations.*

*Id.* at ¶ 39. (Emphasis added in the original).

Plaintiffs cite another Columbia 10–K Form during the Class Period that reads, in pertinent part:

> The Company's annual cost reports which are required under the Medicare and Medicaid programs are subject to audit, which may result in adjustments

to the amount ultimately to be due to the Company under these reimbursement programs.... *Management believes that adequate provision has been made in its initial [as filed] statements for any material retroactive adjustments that might result from all of such audits and that final resolution of all of these issues will not have a material adverse effect upon the Company's results of operations or financial position.*

*Id.* at ¶ 41 (emphasis added).

Plaintiffs allege that the discovery of defendants' unlawful practices, in fact, has had a material and negative effect on Columbia's financial position and its stock price. *Id.* at ¶ 40. Thus, the statements in these documents to the contrary are alleged to be false.

Plaintiffs further refer to Columbia Company's Forms 10–Q from April 1994 to September 1997 describing a business strategy to provide a comprehensive range of healthcare related services. *Id.* at ¶ 43. These forms conveyed "the impression that Columbia was employing legitimate and lawful means to effects its corporate growth strategy." *Id.* Yet, according to plaintiffs, these 10–Q Forms omitted disclosures of Columbia's actual practices and

> failed to state, however, that the Company's "strategic plan" and "business strategy" included many improper procedures, strategies and conduct, described more particularly herein, that were designed to artificially inflate its revenues and earnings. *By failing to disclose the true and complete business strategy the Company was employing throughout the Class Period, investors were unable to determine for themselves whether the Company's acts, as described herein, were unlawful and whether they would expose the Company to civil and criminal penalties, and even prosecution. The Company's failure to fully disclose*

*the methods it was employing, including upcoding and the other conduct alleged herein, artificially inflated the Company's stock price during the Class Period.*

*Id.* at ¶ 43. Plaintiffs do not allege who prepared and/or signed these forms, but contend that these expanded facilities were used to obtain unlawful higher reimbursements. Thus, these statements were false.

According to the plaintiffs, Columbia's public damage control after the federal investigation was "to stem the negative impact that revelation of the full extent of its fraudulent practices would inflict on its business operations and its stock price...[by] falsely maintaining that its unlawful acts reported in the press were limited to certain individuals, specific hospitals, and isolated regions, and were not systemic or widespread throughout the Company." *Id.* at ¶ 65. As noted earlier, on March 21, 1997, Jim Prescott, a Columbia spokesman, told a news agency that "We still think this is confined to El Paso." *Id.* at ¶ 70. Columbia continued to deny the scope and materiality of the investigation, stating that the investigation would not spread. *Id.* at ¶ 65. Columbia's assurances to the market cushioned the decline in Columbia's stock. After the July 1997 searches and resignations of senior officials, on September 7, 1997, Columbia announced that the federal investigations "would negatively impact Columbia's profits". *Id.* at ¶ 72.

### k. Individual Defendants' Acts

#### 1. Scott

As to plaintiffs' factual allegations about the individual defendants' acts, Scott, Columbia's founder, was appointed its Chief Executive Officer in 1987, and was Chairman of the Board in 1996. *Id.* at ¶ 11a. Until July 25, 1997, Scott was also a member of Columbia's Executive Committee, that has the authority to exercise substantially all powers of the full Board. *Id.*

Scott signed the Company's 10–K forms for 1993, 1994, 1995 and 1996. For the fiscal year ending December 31, 1996, Scott received a salary of $900,000 and other compensation in the form of restricted stock awards, options and other executive plans. *Id.* By May 15, 1997, Scott owned 9,401,884 shares of Columbia common stock representing 1.4% of the Company's shares outstanding. During the Class Period, Scott sold approximately 105,000 shares of Columbia common stock for proceeds of approximately $4.4 million. *Id.* Scott also disposed of stock by making gifts to undisclosed recipients that transferred approximately 3.2 million shares valued at approximately $79 million. *Id.*

As to his corporate activities, Scott held weekly management committee and development meetings that were attended by other senior management officers and directors, including Frist and Vandewater, to discuss Columbia's business and operations. *Id.* Scott was regularly briefed with Vandewater by Leon Drennen, a senior vice-president on Columbia's internal audit reports. *Id.* at ¶ 78. Scott was involved in the solicitation and recruitment of Dr. Schlichtemeier. *Id.* at ¶ 55. Scott made a job offer to Geanes. *Id.* at ¶ 53. On July 25, 1997, Scott was forced to resign from his positions of Chief Executive Officer, Chairman of the Board and Director of Columbia. *Id.* at ¶ 4a.

#### 2. Vandewater

Vandewater became Columbia's Chief Operating Officer in September 1993. *Id.* at ¶ 11b. In 1996, Vandewater's cash compensation was $791,000 with options to purchase 150,000 shares of Columbia common stock. *Id.* During the Class Period, Vandewater sold approximately 90,000 shares of Columbia common stock, for proceeds of approximately $5 million. *Id.* On July 25, 1997, Vandewater was forced to

resign as Chief Operating Officer of the Company. *Id.*

As to Vandewater, Ford's affidavit refers to Leon Drennen, a corporate senior vice-president over Columbia's in-house audit staff, who "regularly received summaries of quarterly audit reports created by employees in Columbia's Office of Consulting and Audit Services." *Id.* at ¶ 78. Drennen "regularly briefed Samuel Greco, the former Senior Vice President of Columbia for Operations, and Vandewater and Scott on the issues in the audit findings, including Medicare reimbursement issues." Vandewater also reviewed "score cards" of individual hospital chief executive officers and vice-presidents that would include his criticisms. *Id.* at ¶ 75.

### 3. Frist

Until July 25, 1997, Frist was Vice Chairman of Columbia's Board. Frist founded the former Health Corporation of America ("HCA"), and from 1978 to 1994 was its President and Chief Executive Officer. *Id.* By May 15, 1997, Frist owned over 14.5 million shares of Columbia [6] common stock, representing 2.2% of its outstanding shares. *Id.* During the Class Period, Frist gave approximately 6,000,000 shares of Columbia stock as gifts to undisclosed recipients and transferred stock among trusts he controls, totaling in excess of $300 million. *Id.* On July 25, 1997, First was appointed Chief Executive Officer and Chairman of the Board of Columbia. *Id.* At all relevant times, Frist was a member of Columbia's Executive Committee and attended management meetings. Id. at ¶¶ 11a and 11c. Frist signed the Company's 10–K forms for 1993, 1994, 1995, and 1996. *Id.* at ¶ 11c.

### 4. McWhorter

McWhorter, a Columbia director since 1995, served as Columbia's Chairman from April 1995 through May 1996. *Id.* at ¶ 11d. Previously, McWhorter was Chairman and Chief Executive Officer of HealthTrust Incorporated ("Health-Trust") [7] from 1987 through 1995, and was HCA's President and Chief Operating Officer from 1985 through 1987. *Id.* McWhorter was a HCA director from 1983 through 1987. On April 24, 1995, McWhorter entered into a two-year employment agreement with Columbia with a base salary of $600,000. *Id.* McWhorter terminated his employment with Columbia in 1996, but was entitled to receive his base salary until April 24, 1997. *Id.* To terminate a severance protection agreement that McWhorter had with Healhtrust, Columbia paid McWhorter $2.4 million and accelerated the vesting of 20,115 shares of restricted Columbia stock on July 1, 1995. *Id.* During the Class Period, McWhorter sold approximately 1.1 million shares of Columbia common stock, for in excess of $55 million and disposed of approximately 270,000 shares valued at about $13 million, by gifts to undisclosed recipients. *Id.* McWhorter was a member of Columbia's Executive Committee during the Class Period and signed the Company's 10–K forms for 1995 and 1996. *Id.*

### 5. Reichardt

Reichardt is a member of the Board and served as Chairman of Columbia's Audit Committee throughout the Class Period. *Id.* at ¶ 11e. The Audit Committee's functions included reviewing the programs of Columbia's internal auditors, the results of their audits, and the adequacy of the company's system of internal controls and accounting practices. *Id.* The

---

**6.** Columbia merged with HCA in 1995. See *McCall* Amended Complaint at ¶ 4a.

**7.** Columbia acquired HealthTrust in 1995. *McCall,* Docket Entry No. 25, Amended Complaint at ¶ 4d.

Audit Committee also meets "regularly with management, internal auditors and Ernst & Young, LLP, the Company's outside auditor," to review audit plans and results as well as management's actions in discharging responsibilities for accounting, financial reporting, and internal control. *Id.* Reichardt signed Columbia's 10–K forms for 1993, 1994, 1995 and 1996. *Id.*

### 6. Averhoff

Averhoff, a physician, has been a member of the Board since 1992. *Id.* at ¶ 11f. Averhoff, who practiced medicine in Miami for over five years, is also an investor in Columbia's Cedars Medical Center in Miami, Florida that was earlier cited as having significantly higher CMIs after Columbia acquired Cedars. *Id.* at ¶ 34. Averhoff has been a member of Columbia's Audit Committee throughout the Class Period. *Id.* at ¶ 11f Averhoff signed the Company's 10–K forms for 1993, 1994, 1995 and 1996. *Id.*

### 7. Long

Long has been a member of the Columbia Board since 1991 and in 1994 and 1995 was a member of Columbia's Audit Committee. *Id.* at ¶ 11h. During the Class period, Long sold approximately 1.5 million shares of Columbia common stock for proceeds in excess of $60 million. *Id.* Long signed Columbia's 10–K forms for 1993, 1994, 1995 and 1996. *Id.*

### 8. MacNaughton

MacNaughton has been a member of the Board since 1995 and has been a member of the Columbia's Audit Committee since 1995. *Id.* MacNaughton signed the Columbia's 1995 and 1996 10–K form. *Id.* During the Class Period, MacNaughton transferred by gifts to undisclosed recipients in excess of 30,000 shares of Columbia common stock with a value of over $1 million. *Id.*

### 9. Additional Scienter Allegations

For their allegations of scienter, plaintiffs cite the insider trading of Scott, Vandewater, Frist, Long, and McWhorter. *Id.* at ¶ 73. In addition, plaintiff cited the use of inflated stock to acquire companies and Columbia's executive compensation system. *Id.* at ¶ 76.

According to the plaintiffs' allegations, the defendants' scienter is reflected in Columbia's maintenance of annual cash incentive and long term incentive plan awards that required the achievement of certain operating income objectives and performance goals. *Id.* at ¶¶ 73, 74 and 75. The annual cash awards were equal to 80% of the base salary for the chairman and president, and 50% of the base salaries for other executive officers. *Id.* at ¶ 74. Executives' bonuses were based on two factors: earnings per share and a discretionary component. *Id.* In 1996, "all named executives, [were awarded] a bonus of 100% of the target bonus and granted . . . options to purchase 550,000 shares of common stock". *Id.* Such a system provided an incentive to inflate Columbia's financial performance. *Id.* It is unclear to the Magistrate Judge that any of the named individual defendants actually received such bonuses.

Columbia also "required" its administrators and physicians to meet certain goals for the "number and frequency of medical procedures." *Id.* at ¶ 75. For each CEO and vice president of each hospital, Columbia had "score cards" to "emphasize profitability over patient care for the purpose of artificially inflating the price of stock held and sold by the Individual Defendants." *Id.*

For its fraud on the market claim, plaintiffs' allege that until March 19, 1997, Columbia's fraudulent practices, designed to increase its income and artificially inflate its stock price, were unknown to the pub-

lic. Therefore, the defendants were successful in achieving their objectives of artificially increasing the price of Columbia's stock. *Id.* at ¶ 81. On March 19th, however, with the intervention of federal agencies, defendants' fraudulent scheme began to be revealed. *Id.*

In a paragraph labeled "The Individuals Defendants Were Aware of the Fraud," plaintiffs state:

> The affidavit of Special Agent Ford states that Leon Drennen, a corporate senior vice-president overseeing Columbia's in-house audit staff, regularly received summaries of quarterly audit reports created by employees in Columbia's Office of Consulting and Audit Services. Drennen in turn regularly briefed Samuel Greco, the former Senior Vice President of Columbia for Operations, and Vandewater and Scott on the issues in the audit findings, including Medicare reimbursement issues.

*Id.* at ¶ 78. Plaintiffs also allege that documents were labeled "Attorney Client Privileged" to prevent their disclosure to federal and state agencies. *Id.* at ¶ 79.

### B. Plaintiffs' Legal Theories

Plaintiffs assert several legal claims based upon these factual allegations. First, plaintiffs contend that the defendants violated 15 U.S.C. § 78j(b) and Rule 10b–5 in that "individually and in concert," either "directly or indirectly", defendants "caused to be issued" or "failed to disclose or cause the disclosure" of deceptive, false and misleading statements with reckless disregard of the truth of such statements. *Id.* at ¶¶ 85 through 88. Such statements artificially inflated Columbia's stock price, and but for such statements and omissions, plaintiffs would not have purchased Columbia stock. *Id.* at ¶¶ 88 through 91.

Second, plaintiffs characterize the individual defendants as "controlling persons" who "had the power and influence and exercised the same to cause Columbia to engage" in the alleged illegal conduct, thereby rendering them liable under Section 20(a) of the 1934 Act. *Id.* at ¶¶ 93–94.

For the third claim, plaintiff Stephen S. Schuster Profit Sharing Plan alleges that defendants violated §§ 11 and 12 of the 1933 Act and § 14 of the 1934 Act in connection with the merger of Columbia and Medical Care. Plaintiff Schuster received Columbia shares after this merger that was based upon a false proxy statement that Columbia was in compliance with the Anti-fraud amendments of the Medicare and Medicaid laws. *Id.* at ¶ 99. The precise language of this proxy statement is not set forth in the complaint.

As to the particulars of the theories for these claims, plaintiffs assert that the defendants' use of SEC and the New York Stock Exchange, as well as other national public reporting services, caused the alleged fraud to be effective upon the national stock market, giving rise to the "fraud on the market" doctrine under federal securities law. *Id.* at ¶¶ 81–82.

> At all pertinent times, the market for Columbia's stock was efficient for, among other things, the following reasons: (a) Columbia common stock was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market; (b) Columbia filed required periodic public reports with the SEC and the New York Stock Exchange; (c) Columbia regularly communicated with public investors through established market communication mechanisms, including regular disseminations of press releases on the national circuits of news wire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (d) Columbia was followed by several securities analysts employed by major bro-

kerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

*Id.* at ¶ 81.

Plaintiffs contend that as officers and directors of a publicly-held company, the individual defendants owed duties to Columbia's investors "to disseminate timely, accurate, truthful, and complete information about Columbia's operations, financial condition, performance and future prospects to ensure that the Company's stock price was based on truthful, accurate and complete information." *Id.* at ¶ 12.

## III. CONCLUSIONS OF LAW

### A. Standard of Review

The general rule on a motion to dismiss is for the Court to determine whether there are any circumstances in which the plaintiffs can state a claim for relief, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) under a notice pleading standard pursuant to Fed.R.Civ.P. 8. To evaluate the legal sufficiency of a complaint, the Sixth Circuit observed that "our standard of review 'requires more than bare essentials of legal conclusions'". *Columbia Natural Resources, Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995) *cert. denied,* 516 U.S. 1158, 116 S.Ct. 1041, 134 L.Ed.2d 189 (1996). "[W]e need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987).

Moreover, where, as here, fraud is alleged, Fed.R.Civ.P. 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Court of Appeals has ruled that the provisions of Rule 8 and the requirement of Rule 9(b) are to be read in conjunction with each other. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988). In *Blount Financial Services v. Walter E. Heller & Co.,* 819 F.2d 151, 153 (6th Cir.1987), the Court explained that "Rule 9(b) requiring 'averments of fraud ... with particularity' is designed to allow the District Court to distinguish valid from invalid claims in just such cases as this one and to terminate needless litigation early in the proceedings." Rule 9(b) is also intended "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *American Town Center v. Hall 83 Associates,* 912 F.2d at 104, 109 (6th Cir.1990).

Under *Ameritrust,* the plaintiff can satisfy Rule 9(b)'s requirements by pleading the circumstances of the fraud, not the evidence. 848 F.2d at 690 n. 9. Since *Ameritrust,* however, the Court of Appeals reiterated that the rule of this Circuit is that "... FRCP 9(b) requires that fraud be pleaded with particularity. *To satisfy FRCP 9(b), a plaintiff must at a minimum allege the time, place and contents of the misrepresentations upon which [the plaintiff] relied." American Town Center,* 912 F.2d at 109 (quoting *Bender v. Southland Corporation,* 749 F.2d 1205, 1216 (6th Cir.1984)) (emphasis added).

In addition, where the fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately or otherwise the complaint is legally deficient under Rule 9(b).

The defendants now before the Court comprise a varied group of accounting firms and their employees; law firms and their employees; and bank employees. Yet the complaint makes no attempt to distinguish among them.

This is inadequate; each individual defendant must be appraised separately of the specific acts of which he is accused, especially in a case involving multiple defendants. *Brew v. Philips, Ap[p]el & Walden, Inc.*, CCH Fed.Sec. L.Rep. ¶ 97,697 [1980 WL 1461] (S.D.N.Y.1980); *Goldberg v. Meridor*, 81 F.R.D. 105 (S.D.N.Y.1979). 'The complaint, therefore, may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.' *McFarland v. Memorex Corp.*, 493 F.Supp. 631, 639 (N.D.Cal.1980), *quoting Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518 (S.D.N.Y.1977).

*Benoay v. Decker*, 517 F.Supp. 490, 493 (E.D.Mich.1981), *aff'd* 735 F.2d 1363 (6th Cir.1984).

Plaintiffs contend that Rule 9(b) does not apply to their Section 11 and 12(2) claims because those claims do not include scienter as an element, citing *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir.1997). Yet, as the Eighth Circuit observed, the Third, Fifth, Seventh, and Ninth Circuits do impose Rule 9(b) requirements where the factual allegations of the complaint assert fraud. *Id.* (citing *inter alia In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1404, 1405 (9th Cir.1996) *cert. denied*, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997)). The reasoning of these circuits is that if the plaintiff alleges fraud as a factual matter, then Rule 9(b) applies as in any other civil action, but scienter is not an element of this claim. *Stac Electronics*, 89 F.3d at 1405, n. 3. In *NationsMart*, there were no allegations of fraud, 130 F.3d at 315. In addition, Courts have applied Rule 9(b) to Section 14 claims. *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F.Supp. 1037, 1055 (S.D.N.Y.1992).

Here, the plaintiffs' complaint is full of allegations of fraud, including contentions that the defendants perpetrated a fraud on the market (Docket Entry No. 73, Amended Complaint at ¶ 81). The Magistrate Judge follows the majority of the Circuits on this issue and because plaintiffs have made extensive allegations of fraud, Rule 9(b) requirements apply to the pleading of plaintiffs' securities claims.

Before addressing the substantive law issues, there is the parties' motion for judicial notice of Columbia's public filings (Docket Entry Nos. 86 and 131) as well as a request for a review of the redacted Ford affidavit (Docket Entry Nos. 99 and 129). The parties cite on their motions. See (Docket Entry No. 96, Plaintiffs' Memorandum at p. 15 n. 13).

Under Fed.R.Civ.P. 10(c), any matters attached to the pleadings are considered part of the pleadings. Yet, under Fed. R.Civ.P. 12(b)(6), if the Court considers any matters outside the scope of the pleadings, the motion is deemed a motion for summary judgment. The Court, however, is not required to consider such matters, but the parties contend that courts allow such filings and references to the matter referred to in the pleadings.

As support for this motion, plaintiffs cited the decision in *Weiner v. Klais and Co., Inc.*, 108 F.3d 86 (6th Cir.1997). In *Weiner*, the Court reiterated the general rule that: "Matters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." *Id.* at 98, (citations omitted.) To be sure, the Court noted an exception, but the exception, in securities cases, applies only to papers filed by a defendant.

The [District] court held ...it would consider 'only those exhibits submitted by the defendant which can properly be considered incorporated by reference

into the complaint, and, thus, a part of the pleadings.'

Rule 10(c) is permissive, and a plaintiff is under no obligation to attach to his complaint documents upon which his action is based. *However, a defendant may introduce certain pertinent documents if the plaintiff fails to do so.* Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied. Hence, the Seventh Circuit has held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." We believe that this approach is appropriate. *Id.* at 89 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993) (emphasis added and citations omitted.)) *Accord, Nieman v. NLO, Inc.,* 108 F.3d 1546, 1555 (6th Cir.1997) ("documents that *a defendant* attaches to a motion are considered part of the pleadings if they are referred to in the plaintiffs' complaint and are central to her claim")(emphasis added).

■ Accordingly, the Magistrate Judge denies to the plaintiffs' motion to take judicial notice (Docket Entry No. 131) and declines the request to consider the redacted Ford affidavit, but grants the defendants' motion (Docket Entry No. 86). The merits of defendants' motions, however, will be decided on the basis of the allegations in the amended complaint.

### B. Applicability of the PSLRA

For federal securities claims under 15 U.S.C. § 78a *et seq.,* Congress has imposed additional pleading requirements and provided for judicial review of such complaints before any discovery. On December 22, 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") that now requires more specificity in pleadings in private securities litigation before discovery.

(b) Requirements for securities fraud actions. (1) Misleading statements and omissions. In any private action arising under this title [15 USCS §§ 78a et seq.] in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind. In any private action arising under this title... [15 USCS §§ 78a et seq.], the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

(3) Motion to dismiss, stay of discovery.(A) Dismissal for failure to meet pleading requirements. In any private action arising under this title [15 USCS §§ 78a et seq.], the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

\* \* \* \* \* \*

(B) Stay of discovery. In any private action arising under this title [15 USCS §§ 78a et seq.], all discovery and other proceedings shall be stayed during the pendency of any motion to

dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C. § 78u–4(b)(1)(A), (b), 2, and 3(b) (emphasis added).

The purpose of the Act was to "protect investors, issuers and all who are associated with our capital markets from abusive securities litigation" as well as "to implement [ ] need[ed] procedural protections to discourage frivolous litigation". H.R. Conf. Rep. 104–369, 104th Cong. 1st Sess. 31, 31 (1995), U.S.Code Cong. & Admin.News 1995, 730.

The significance of the underscored phrase "strong inference" is that this phrase has generated a split among the courts on whether the PSLRA codified the prior decisional law of the Second Circuit, as plaintiffs contend, or whether this Act creates a new and heightened pleading standard, as defendants argue. For the reasons that follow, the Magistrate Judge concludes that Congress intended the heightened pleading standard and rejected the Second Circuit standard for evaluating the legal sufficiency of securities complaints.

The conflicting opinions on this issue are fairly summarized in *In re Comshare, Inc., Sec. Lit.*, 1997 WL 1091468, 1997 U.S. Dist. LEXIS 17262 (E.D.Mich.1997) that reviewed the relevant precedents and the legislative history of the PSLRA. In *Comshare,* the Court noted that under the Second Circuit standard, scienter could be adequately pled by allegations of motive and opportunity to commit fraud or "strong circumstantial evidence of fraud". *Id.* at *2 (citation omitted). The Magistrate Judge agrees with *Comshare* that the legislative history clearly reveals Congress' intention to heighten the pleading beyond the Second Circuit standard.

To decide the issue, the Court in *Comshare* quoted from the legislative history of the PSLRA stating:

The House Conference Committee Report is illuminating on the issue. It states:

Naming a party in a civil suit for fraud is a serious matter. Unwarranted fraud claims can lead to serious injury to reputation for which our legal system effectively offers no redress. For this reason, among others, Rule 9(b) of the Federal Rules of Civil Procedure requires that plaintiffs plead allegations of fraud with "particularity." The Rule has not prevented abuse of the securities laws by private litigants. Moreover, the courts of appeals have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits. The House and Senate hearings on securities litigation reform included testimony on the need to establish uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits.

The Conference Committee language is based in part on the pleading standard of the Second Circuit. The standard also is specifically written to conform the language to Rule 9(b)'s notion of pleading with "particularity."

Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts, in turn, must give rise to a "strong inference" of the defendant's fraudulent intent. *Because the Conference Committee intends to strengthen existing pleading requirement it does not intend to codify the Second Circuit's case law interpreting this pleading standard.*

\* \* \* \* \* \*

*For this reason, the Conference Report chose not to include in the pleading standard language relating to motive, opportunity, or recklessness.*

*Id.* at *2–*3 (quoting H.R. Conf. Rep. No. 104–369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. at 740) (emphasis added and footnotes omitted). There is no contrary Senate Conference Report to refute these representations.

Moreover, the Court in *Comshare* found significant the President's veto message on the PSLRA that also reflected Congress' intention not to adopt the Second Circuit standard.

President Clinton recognized that Congress was setting an increased pleading standard under the PSLRA when he vetoed the bill. His veto message to Congress stated:

[I] am prepared to support the high pleading standard of the U.S. Court of Appeals for the Second Circuit—the highest pleading standard of any Federal Circuit court. *But the conferees make crystal clear in the Statement of Managers their intent to raise the standard even beyond that level. I am not prepared to accept that.*

*The Conferees* deleted an amendment offered by Senator Specter and adopted by the Senate that specifically incorporated Second Circuit case law with respect to pleading a claim of fraud. Then *they specifically indicated that they were not adopting the Second Circuit case law but instead intended to "strengthen" the existing pleading requirements of the Second Circuit. All this shows that the conferees meant to erect a higher barrier to bringing suit than any now existing....* H.R. Doc. No. 104–150, 104th Cong., 1st Sess. at 1 (1995)

*Id.* at *3 (emphasis added and footnote omitted). The Court then noted Congress'

override of the President's veto of the PSLRA. *Id.*

The Magistrate Judge agrees with *Comshare* that the legislative history of the PSLRA clearly reveals Congress' intention to heighten the pleading requirements for securities claims under 15 U.S.C. § 78a *et seq.* Other courts have reached this conclusion. *Epstein v. Itron Inc.,* 993 F.Supp. 1314, 1319 (E.D.Wash. 1998); *Powers v. Eichen,* 977 F.Supp. 1031, 1038 (S.D.Cal.1997).

The plaintiffs have recently submitted a report of the United States Senate Committee on Banking, Housing and Urban Affairs to the effect that the Committee did not intend the PSLRA to alter the pleading standard for scienter, but rather to set the Second Circuit rule as a uniform standard. As noted earlier, there is no cited Senate Conference Report to this effect. The Magistrate Judge respects the views of this Senate Committee, but is required to consider the PSLRA's entire legislative history, including the views of the President and the House.

 Under the applicable law, the Courts consider legislative committee reports on a bill as authoritative on Congressional understanding. *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). Substantial deference is given to Conference Committee reports, because they reflect the consensus of both the Senate and House. "Because the conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent." *Demby v. Schweiker,* 671 F.2d 507, 510 (D.C.Cir.1981). *Accord, Railway Labor Executives Assn. v. Interstate Commerce Comm.,* 735 F.2d 691, 701 (2d Cir. 1984); *City of New York v. U.S. Dept. Of Transportation,* 700 F.Supp. 1294, 1303 (S.D.N.Y.1988). Given the reasons for the

Presidential veto and its reference to the statements of the Conference Committee managers, the House Conference Report, and the lack of a Senate Conference Report, the Magistrate Judge adheres to the conclusion in *Comshare* on this issue.

The Magistrate Judge also adopts the *Comshare* formulation of the test under the PSLRA for pleading a Rule 10b–5 claim.

[I]t is not enough to allege recklessness, or motive and opportunity, in order to establish a defendant's scienter in a securities fraud case brought pursuant to 10(b) of the 1934 Securities Exchange Act and Rule 10b–5 of the Securities and Exchange Commission...

Plaintiffs must plead specific facts that create a strong inference of knowing misrepresentation on the part of the defendants.

Merely pleading that the information was available to the defendants is not enough. Although that may, or may not, suffice to establish recklessness, it does not create a strong inference of conscious misbehavior....

Moreover, allegations such as plaintiffs, that the defendants knew or acted with reckless disregard for the truth are 'so broad and conclusory as to be meaningless.'

*Id.* at *3

These principles apply to the Magistrate Judge's evaluation of the legal sufficiency of the plaintiffs' claims, but first a review of the substantive law on plaintiffs' 10b–5 claims is necessary.

### C. Plaintiffs Rule 10b–5 Claims

At the outset, the defendants argue that to qualify as a Rule 10b–5 claim, the alleged act or omission, particularly as to billing practices, had to occur "in connection with" the sale of securities. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10(b)(5). (Docket Entry No. 84, Defendants' Memorandum at p. 20). *See Central Bank, N.A.*

*v. First Interstate Bank, N.A.,* 511 U.S. 164, 177, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119, 132 (1994) (holding that Section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act").

Not all unlawful acts of the corporation give rise to securities liabilities. *Allard v. Arthur Andersen & Co.,* 924 F.Supp. 488, 496–97 (S.D.N.Y.1996) (dismissing 10b–5 action because alleged embezzlement scheme was not carried out in connection with the purchase or sale of securities), but transactions, acts or practices that materially affect the financial condition of the seller of securities can qualify as "acts" in connection with the sale of securities. *Gladwin v. Medfield Corp.,* 540 F.2d 1266, 1268–69 (5th Cir.1976); (overpayment of federal funds sufficient to be in connection with sale of securities, if material.); *Greenfield v. Professional Care, Inc.,* 677 F.Supp. 110, 113 (E.D.N.Y.1987). ("Information going directly to the financial condition of the company falls squarely within the range of information" that an investor would consider.)

As applied here, Medicare and Medicaid reimbursements constitute 40% of Columbia's revenues totaling over $8 billion a year (Docket Entry No. 73, Amended Complaint at ¶ 22). Columbia's 10–K reports refer to Columbia's reimbursements and marketing strategy for services subject to reimbursement under these programs. (*Id.* at ¶¶ 39 and 41).

The Magistrate Judge concludes that any violation of Medicare and Medicaid laws is sufficiently in connection with the sale of Columbia's securities to be a predicate offense for a securities violation, if the violations would materially impact Columbia's financial condition. Given Columbia's announcement that the government's investigation will materially impact its financial condition (Docket Entry No.

78, Amended Complaint at ¶ 72), the Magistrate Judge deems Columbia's billing practices and cost reports covered by that investigation, to be subject to federal securities laws. Whether all of the plaintiffs' allegations meet this standard will be analyzed as to the particular practice.

Under Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder, there is a legal proscription that:

It shall be unlawful for any person ... (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10(b)(5).

In *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court explained that:

The 1934 Act was designed to protect investors against manipulation of stock prices. See S.Rep. No. 792, 73d Cong., 2d Sess., 1–5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H.R. Report No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the 'fundamental purpose' of the Act as implementing a 'philosophy of full disclosure.'" *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477–478, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), quoting *SEC v. Capital Gains Research Bureau,*

*Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

*Basic,* 485 U.S. at 230, 108 S.Ct. 978.

To state a claim under § 10(b) and Rule 10b–5, a plaintiff must plead that the defendant had the "obligation to disclose" and engaged in the "withholding of a material fact" that "a reasonable investor might have considered ... important in the making of [the decision] to purchase the company's security." *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In a word, the defendant must be under a duty to disclose, make a false statement or omit a material fact which should have been disclosed, and the plaintiff must reasonably rely upon the statement or omission, thereby proximately causing the plaintiff's injury. *Auslender v. Energy Management Corp.,* 832 F.2d 354, 357 (6th Cir.1987) (citing *Inter alia Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

### 1. Duty of Disclosure

The threshold requirement is that the defendant must have violated an affirmative duty of disclosure. *Basic,* 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5"). Here, the plaintiffs' amended complaint is that "Columbia's public statements have consistently created the false and misleading impression of a company with fast-growing revenues and earnings and attempting to operate in compliance with all applicable laws and regulations." (Docket Entry No. 73, Amended Complaint at ¶ 3.) In addition, the plaintiffs allege that

*By failing to disclose the true and complete nature of the business strategy,* the company was employing throughout the Class Period, investors were unable to determine for themselves whether the company's acts, described herein, were

unlawful and whether they would expose the Company to civil and criminal penalties, and even prosecution. *The Company's failure to fully disclose the methods it was employing, including upcoding and the other conduct alleged herein, artificially inflated the Company's stock price during the Class Period.* *Id.* at ¶ 43 (emphasis added). Other allegations are that "Columbia's facilities failed to disclose" particular practices that are set out in other paragraphs of the complaint. *Id.* at ¶ 47 (cost shifting); ¶¶ 61 and 63 (Stark violations). "Had plaintiffs and other members of the Class known of the materially adverse information misrepresented *or not disclosed by defendants,* they would not have purchased Columbia securities at the artificially inflated prices that they did." *Id.* at ¶ 89 (emphasis added).

■ According to plaintiffs, defendants should have disclosed the facts about their upcoding, cost shifting and billing practices (Docket Entry No. 96, Plaintiffs' Memorandum at p. 8). In this Circuit, the Securities Act does not create a duty for a company to disclose the details of its business practices or to opine about their legal propriety. In *In re Sofamor Danek Group, Inc.,* 123 F.3d 394 (6th Cir.1997), the plaintiffs alleged securities fraud violations based upon the defendants' statements in the company's prospectus, 10–K forms, and public statements that described its marketing practice for its spinal implant devices for surgery. Plaintiffs alleged that, "the defendants made deceptive and materially false and misleading statements which, coupled with the defendants' failure to disclose information that allegedly ought to have been disclosed". *Id.* at 399. These representations allegedly "caused the company's stock to trade at artificially inflated prices", such that "much of [the defendants] sales success had been due to [its] illicit promotion of its products...." *Id.* at 399, 401. Further,

the plaintiffs in *Sofamor* alleged that "the market was unaware that the company was improperly promoting its products for pedicular use and that such promotion was having a material impact on the company's financial position." *Id.* According to those plaintiffs, "the market was ignorant of the fact that 'improper' sales through the loaner set program constituted a significant source of the company's earnings." *Id.*

The plaintiffs' theory about the misrepresentations of its earnings in company reports was that:

These statements and reports created "the impression that SDG's [Sofamor Danek Group's] tremendous growth in revenues and earnings was due to an increase in legitimate unit sales of SDG's products," the complaint avers. *"Defendants were aware this was not the case,"* the complaint continues, and *"were aware during the Class Period that much of SDG's sales success had been due to SDG's illicit promotion of its products for use in the pedical area of the spince."* Moreover, the complaint alleges, *"defendants disavowed any knowledge of wrongful promoting of pedicle screws,"* and they *"down played any positive financial effects from loaner sales."*

*Id.* at 401–02. (Emphasis added.)

The Sixth Circuit, however, rejected those theories and affirmed the District court's order of dismissal, reasoning that:

Before liability for nondisclosure can attach, the defendant must have violated an affirmative duty of disclosure. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5". Ordinarily, at least, a company is under no duty to disclose the details of its merchandising practices. If we were prepared to assume in the case at bar that Sofamor Danek's merchandising practices constituted material information

for purpose of the federal securities laws, however, that in itself would not be dispositive of the question whether disclosure was required. Materiality alone is not sufficient to place a company under a duty of disclosure.

*Id.* at 400 (quoting *Basic,* 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17.) (Other citations omitted). *Accord, Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir. 1987).

The Sixth Circuit also rejected the theory of liability that the company's 10–K reports and public statements were misleading and false due to the omission of these practices.

*The proposition that the company was engaging in illegal promotion of its products* when it helped fund the Spinal Science Advancement Foundation and allowed its sales representatives ("independent commission sales representatives," according to the 10–K forms) to attend operations where surgeons made attachments to the pedicle *is not a proposition that can fairly be said to fall in the category of "hard" information. Hard information "is typically historical information or other factual information that is objectively verifiable ...."* Garcia v. Cordova, *930 F.2d 826, 830 (10th Cir.1991). Such information is to be contrasted with "soft" information, which includes predictions and matters of opinion. See* Lewis v. Chrysler Corp., *949 F.2d 644, 652 (3d Cir. 1991). The legality of Sofamor Danek's support for the non-profit foundation, for example, was a matter of opinion— "soft information." And "our cases firmly establish the rule that soft information ... must be disclosed only if ... virtually as certain as hard facts."* Starkman v. Marathon Oil Co., *772 F.2d 231, 241 (6th Cir.1985), cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986).

If the company had publicly opined that its support of the nonprofit foundation was illegal, and if it had publicly predicted that the FDA would move against the company, the opinion would have come to look increasingly questionable with the passage of time, and the prediction would have proved to be flatly erroneous. This illustrates, we think, why predictions not "substantially certain to hold," like most matters of opinion, simply do not come within the duty of disclosure. *See Starkman,* 772 F.2d at 241.

*... [w]e see nothing in the company's public statements which gave rise to a duty to disclose more than was disclosed about the loaner kit program.* At the very outset of its life as a publicly traded corporation, Danek stated publicly that hospitals were charged premium prices for loaner kit components not returned to the company.

*Id.* at 402 (emphasis added).

Moreover, here, as in *Sofamor,* there was a disclosure in the defendant's papers of a government inquiry about its practice.

...Sofamor Danek did disclose its receipt of the warning letter from the FDA regarding the company's support for medical programs demonstrating the use of screws in the pedicle. In discussions with stock analysts, it is true, the company 'downplayed' the significance of the warning letter—but any analyst could easily obtain a copy of the letter and could make an independent judgment of its significance.

The hard fact is that no regulatory action was initiated during the Class Period. And as far as we have been advised, none has been initiated to date.

*Id.* at 402.

As applied here, plaintiffs' claims that the defendants' SEC filings did not disclose the details of Columbia's business

practices are without merit because under *Sofamor,* the defendants owed no such duty of disclosure. Under *Sofamor,* the failure to disclose the underlying practice does not render the SEC reports or other public statements false or misleading. Under *Sofamor,* Columbia also did not have to opine whether it violated Medicare and Medicaid regulations in its billing practices. Moreover, to the extent that Columbia did opine about its practices, such opinions involve "soft information" that under *Sofamor* are not actionable.

The plaintiffs attempt to distinguish their complaint from the complaint in *Sofamor* by arguing: (1) that their contention is that Columbia's financial data is factually inaccurate and that Columbia knew its revenues and earnings were artificially inflated; (2) unlike *Sofamor* there is a grand jury proceeding against Columbia and several of its officials have been charged with criminal fraud for over billing; (3) Columbia's stock price has not recovered; and (4) that the plaintiffs' claims on disclosure here involve the defendants' failure to disclose hard information about its practices and conduct. *Id.* The Magistrate Judge respectfully disagrees.

As to the distinction that the plaintiffs' claims are about hard information, i.e., inaccurate and inflated revenues, that claim is premised upon the contention that Columbia's billing practices are unlawful. Similarly, in *Sofamor,* the plaintiffs' allegations of inflated revenues and earnings were because "much of [the defendants] sales success had been due to [its] illicit promotion of its product." 123 F.3d at 401. The Magistrate Judge agrees with the Court's observation in *Greenstone v. Cambex Corp.,* 777 F.Supp. 88, 91 (D.Mass. 1991), that

> Regardless of how the plaintiff purports to characterize the undisclosed information (i.e., about the defendants' improper activity) and its alleged influence on pri-

or statements relating to revenue, she is, in reality, asserting that the defendants had an independent and affirmative duty to disclose the improper activity simply because it was material. Such a duty does not exist.

*Id.* at 91.

Plaintiffs' claim of inflated revenues is not hard information, but is controlled by the issue of the legality of Columbia's business practices. This conclusion also applies to plaintiffs' distinctions that the failure to disclose Columbia's practices involves hard facts such as "upcoding", improper shifting of costs, and improper reimbursement and routine overcharges for laboratory tests (Docket Entry No. 73, Amended Complaint at ¶¶ 31–35, 44–45, 51–52, 57). This is but another form of requiring Columbia to opine about its business practices that is not required under *Sofamor.*

The distinction concerning a government investigation does not control because, as to the named defendants, there is no formal proceeding against them. Like *Sofamor,* the corporation is under investigation, but has not been formally charged.

The last distinction about the decline in stock is not controlling, because the controlling consideration in *Sofamor* was the lack of a duty of disclosure, despite the consequences.

Plaintiffs insist that "the core allegation" of the complaint is that the defendants materially and artificially inflated Columbia's reported financial results of operations: "Throughout the Class Period, Columbia's revenues and earnings, and their growth, were artificially and materially inflated by a pattern and practice of violating federal and state laws." (Docket Entry No. 96, Plaintiffs' Memorandum at p. 6) (quoting Docket Entry No. 73, Amended Complaint at ¶ 3). Yet, this theory and its factual allegations were advanced in *Sofa-*

*mor,* but again the Court declined to accept them.

The Magistrate Judge is unable to distinguish the theory of liability here from the plaintiffs' theory in *Sofamor.* To the extent the plaintiffs here alleged that the sales and financial data in Columbia's 10–K were false and inflated due to its illegal practices, those factual allegations were also present in *Sofamor.* To the extent that statements were made about corporate practices in compliance with applicable laws, those types of statements were present in *Sofamor.* Allegations of illegal marketing practices of Columbia were similarly made in *Sofamor.*

Under *Sofamor,* there is no duty to disclose legal opinions on a company's business practices. The critical issue on the alleged false and misleading statements and omissions involves opinion rather than past data, namely, whether the alleged acts violated the Medicare and Medicaid law, and if so, to what extent is the resulting financial harm. The Sixth Circuit opinion in *Sofamor* holds that such opinions on the legality of marketing practices are not actionable. 123 F.3d at 401–01. *Sofamor* is the more applicable precedent to the factual allegations here and is Sixth Circuit precedent that the Magistrate Judge is bound to follow.

2. False Statements and Omissions

The plaintiffs next claim that Columbia made a false and misleading statement in its 10–K reports that a governmental inquiry would not have an adverse substantial impact, if Medicare violations were found (Docket Entry No. 73, Amended Complaint at ¶¶ 39 and 41.) Columbia's 10–Ks stated about an OIG inquiry that

*The OIG [Office of the Inspector General] has requested information regarding the Company's procedures for preparing Medicare cost reports. The Company is cooperating fully with the OIG and has provided various information in order to explain the Company's assertion that it would not have a material adverse effect on the Company's financial position or results of operations.*

The Company's annual cost reports which are required under the Medicare and Medicaid programs are subject to audit, which may result in adjustments to the amount ultimately to be due to the Company under these reimbursement programs.... *Management believes that adequate provision has been made in its initial [as filed] statements for any material retroactive adjustments that might result from all of such audits and that final resolution of all of these issues will not have a material adverse effect upon the Company's results of operations or financial position.*

(Docket Entry No. 73, Amended Complaint at ¶¶ 39 and 41) (emphasis added). The only other alleged misrepresentations in Columbia's 10–K reports were about Columbia's various facilities and the corporate strategy to provide comprehensive health care. Plaintiffs alleged that instead of such strategy, these facilities were used as vehicles to shift costs allegedly to get higher reimbursements. *Id.* at ¶ 46.

As to Columbia's false or misleading statement about the effect of the OIG inquiry, a similar theory was present in *Sofamor:* [T]he company's president and executive vice-president "downplayed any positive financial effects from loaner sales" in the conference call with stock analysts in October of 1993. 123 F.3d at 399 (emphasis added). The Court found no securities violation from such statements. *Id.* at 401–02.

Under Sixth Circuit precedent, an economic prediction that "suggested reliability, bespoke caution, was made in good faith or had a sound factual or historical basis" does not constitute a false or misleading statement. *Sinay v. Lamson &*

*Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir.1991). As to the OIG billing inquiry, the reference to the initial cost reports as containing sufficient funds to cover any disputed bills has a factual and historical basis. The "as filed" reports and cost reserve reports are used in the accounting practices in this market to cover any "grey areas" (Docket Entry No. 73, Amended Complaint at ¶ 37). Thus, it seems reasonable to infer that if the billing practices were in dispute, the company would have the resources to cover any difference. This issue also involves matters of prediction or opinion that do not lend themselves to precision. This statement was in reference to an OIG investigation. It would be difficult in the years of the Class Period to predict the financial effect of a 1997 criminal investigation of undefined scope that was not known.

Similar allegations about the impact of company practices on company revenues were made unsuccessfully in *Sofamor.* 123 F.3d at 399, 401. The Court rejected that theory.

> Item 303(a)(3)(ii) of SEC Regulation S–K, 17 C.F.R. § 299.303(a)(3)(ii)—an item that pertains to "[m]anagement's discussion and analysis of financial condition and results of operations" for full fiscal years—obligates reporting companies to: " [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as knowing future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed."
>
> *Instruction seven for this item draws a distinction between "forward-looking information," which need not be disclosed,* and *"presently known data which will impact upon future operating results, such as known future increases in costs of labor or materials."* (Emphasis supplied.) *Sofamor Danek could have had no way of knowing with the degree of assurance implied by the instruction that the merchandising practices in question would have a material adverse impact upon future operating results, and we do not read the plaintiffs' complaint as alleging facts sufficient to show a violation of Item 303.*

123 F.3d at 402 (emphasis added). Under *Sofamor,* this claim is without merit.

The plaintiffs' next allegation of a false and misleading statement is that Columbia represented directly or indirectly that its practices comply with applicable laws (Docket Entry No. 78, Amended Complaint at ¶¶ 3, 38). "Columbia's public statements have consistently created the false and misleading impression of a company ... attempting to operate in compliance with all applicable laws and regulations." (Docket Entry No. 73, Amended Complaint at ¶ 3). "The Individual Defendants caused Columbia to issue and disseminate various statements and documents to the investing public, the purpose and effect of which was to lull the public into a belief that the business of Columbia was thriving as a result of legitimate and fair business practices, despite the fact that the opposite was true." *Id.* at ¶ 38. "The Company's Forms 10Q failed to state.... that the Company's 'strategic plan' and 'business strategy' included many improper procedures." *Id.* at ¶ 63. Again, the Magistrate Judge concludes that *Sofamor* controls here and these claims are without merit.

As the plaintiffs correctly note, in *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Supreme Court held that a

statement of opinion may be actionable under section 14a of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a). In *Sandberg,* the issue was whether a statement in a prospectus, concerning a merger, that the stock price was "fair", was actionable. The Court held "that knowingly false statements of reasons may be actionable even though conclusory in form." 501 U.S. at 1087, 111 S.Ct. 2749. Several decisions on actionable opinions have involved opinions on matters such as the adequacy of loan reserves. *U.S. v. Morris,* 80 F.3d 1151, 1163 (7th Cir.1996) (and authorities cited therein). The Sixth Circuit has interpreted *Sandberg* to mean that the opinion is actionable "if the speaker does not believe the opinion and the opinion is not well grounded in fact." *Mayer v. Mylod,* 988 F.2d 635, 639 (6th Cir.1993); *accord Rubin v. Schottenstein Zox & Dunn,* 110 F.3d 1247, 1257 (6th Cir.1997).

The Magistrate Judge is of that view that the controlling issue here is duty of disclosure. One of the decisions cited by the plaintiffs, *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22 (1st Cir.1987) (Docket Entry No. 96, Plaintiffs' Memorandum at p. 8), supports the Magistrate Judge's conclusions. In *Roeder,* the corporation was sued for securities violations arising out of the corporation's failure to disclose that two of its corporate officers bribed a contractor to obtain a subcontract for the corporation. *Id.* at 23, 24. Three weeks before the indictment, the company disclosed that one of its officers would likely be indicted. The Court agreed with the corporation's assertion that "they should not be required to accuse themselves of 'antisocial or illegal practices...' In a sense they are right: information does not become material simply because some may regard it as antisocial or illegal." *Id.* at 25. As to duty to disclose before indictment, the Court ruled that the plaintiff's "complaint does not allege facts that if

proved would establish [the corporation] had a duty to disclose the alleged illegal payment, and affirmed the dismissal of the securities fraud count because of the deficiency." *Id.* at 28. *Sofamor* cited *Roeder* on the duty issue. 123 F.3d at 400. Again, *Sofamor* controls and any opinions expressed by Columbia are not actionable.

 The fact that the individual defendants signed Columbia's 10–Ks is insufficient to state a claim of fraud. Outside directors do not have a duty under Section 10(b) to insure that all material, adverse information is conveyed to prospective purchasers of stock and they can be held liable only if they substantially participated in the fraud of others. *Herm v. Stafford,* 663 F.2d 669, 685 (6th Cir.1981); *accord Lanza v. Drexel & Co.,* 479 F.2d 1277, 1306–09 (2d Cir.1973) (en banc) (affirming dismissal of Section 10(b) claim against outside directors). Further, the mere fact of signing does not create liability for an outside director. *Picard Chem., Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101, 1127 (W.D.Mich.1996) (dismissing fraud claim against outside director based on allegation that director signed disclosure document); *F.N. Wolf & Co. v. Estate of Neal,* [1990–1991 Transfer Binder] Fed.Sec.L.Rep.(CCH) ¶ 95,805, at 98,875, 1991 WL 34186 (S.D.N.Y. Feb. 25, 1991) (dismissing fraud claim in which the "only specific allegation against [outside director] is that he signed the 1988 Form 10–K"). As discussed later, being a corporate director, officer, or member on a corporate committee will not alone create liability. *In re GlenFed, Inc., Sec. Litig.,* 60 F.3d 591, 593 (9th Cir.1995).

There are no factual allegations that the individual defendants had any substantial role in the violations of the Medicare or Medicaid laws. Without such factual allegations reflecting upon each defendants' state of mind, their mere signatures are

legally insufficient to state a claim against them.

Thus, the Magistrate Judge concludes that plaintiffs' allegations about Columbia's 10–K reports and the effects of the company's practices, strategy, and business plans, as well as the impact of the ongoing government inquiry, all involve matters of opinion or future predictions or "forward looking information," and therefore are not actionable. Under *Sofamor*, such facts do not give rise to a duty of disclosure and cannot serve as a predicate for securities fraud for a material omission or false statement of a material fact in a corporation's reports or public statements. In a word, the Magistrate Judge is unable to discern the difference between the pleadings and theories here from those in *Sofamor* and is bound to follow *Sofamor*.

### 3. Scienter

As to proof of scienter, plaintiffs plead insider trading by the defendants Scott, Vandewater, Frist, Long, and McWhorter, who are cited as selling over 12 million shares for $500 million using their insider information (Docket Entry No. 73, Amended Complaint at ¶ 73). In *Sofamor*, the Sixth Circuit ruled that the fact of insider trading, without more, did not establish liability under the securities law.

> Finally, the plaintiffs contend that the individual defendants' "massive insider trading" created a duty to disclose that pedicular use of Sophomore Danek products was being promoted illegally...
>
> District Judge Turner "decline[d] to accept plaintiffs' argument that the allegations of insider trading create a duty that is transferable to the securities fraud claim against the corporate defendant or the individual defendants." In this connection the court cited *In re Seagate Technology II Sec. Litig.*, 843 F.Supp. 1341, 1369 (N.D.Cal.1994) (recognizing that "importing this duty to disclose" would result in potentially

"enormous liability on insider traders— liability that could not be anticipated by Congress").

> *Seagate* seems correct to as ... [T]here nearly always are some insiders selling stock in a given time period. Thus, corporations would be under a duty to disclose all information even colorably material, or face potential second-guessing in a subsequent disclosure suit. Such a rule would deluge investors with marginally useful information, and would damage corporations' legitimate needs to keep some information non-public.

123 F.3d at 403 (quoting *Jordan Eth & Michael Dicke*, 1 Stan. J.L. Bus. & Fin. 97, 109 (1994)) (footnote omitted).

 Sales of stock by insiders create a "strong inference" of scienter only if the sales are "unusual" or "suspicious". *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir.1995) (holding that mere allegations of stock sales by outside director do not give rise to "strong inference" of scienter). Accord *In re Apple Computer Sec. Lit.*, 886 F.2d 1109, 1117–18 (9th Cir.1989) (noting that mere sale of stock by insiders does not create inference of scienter).

Although Scott, Frist, McWhorter, Long, and MacNaughton sold stock, they retained substantial holdings of stock throughout the alleged Class Period. Despite his sales, Scott owns 9,401,884 shares, Frist still owns over 14,500,000 shares, and Vandewater has options of 150,000 shares (Docket Entry No. 73, Amended Complaint at ¶¶ 11a, 11b, and 11c). Such retainage of substantial stock undermines "suspicion" of fraud. *Acito*, 47 F.3d at 54 (dismissing complaint against defendant who sold less than 11% of "shares and/or options"). See also *Worlds of Wonder*, 35 F.3d at 1425 (scienter not present where defendants retained holdings and invested money in the company); *In re Glenayre Tech., Inc. Sec. Litig.*,

982 F.Supp. at 296, 299 (no inference of scienter despite "significant" sales because defendants retained approximately three million shares); *Havenick v. Network Express, Inc.,* 981 F.Supp. 480, 528 (E.D.Mich.1997) (holding inference of scienter "is rebutted by the fact that the [dependants] retained" 68–85% of their holdings). *Duncan v. Pencer,* [1995–1996 Transfer Binder] Fed. Sec.L. Rep. (CCH) ¶99,043, at 94,208, 1996 WL 19043 (S.D.N.Y Jan. 18, 1996) (dismissing complaint because $29 million in stock sales were not "unusual" in light of "substantial holdings" after sales).

Moreover, Reichardt and Averhoff did not sell any stock. This fact tends to negate any inference of ill motive of directors who sold stock. *See In re Burlington Coat Factory Sec. Litg.,* 114 F.3d 1410, 1423 (3d Cir.1997) (holding no inference of scienter where principal officers, two of five defendants did not make any sales); *San Leandro Emergency Med. Plan v. Philip Morris, Inc.,* 75 F.3d 801, 814 (2d Cir.1996). ("[T]he fact that other defendants did not sell their shares ... sufficiently undermines plaintiffs' claims regarding motive.").

In addition, Columbia/HCA announced a $1 billion plan to repurchase its own stock in April, 1997 (Docket Entry No. 25, Amended Complaint at ¶ 70). A company's decision to reinvest its own stock undermines an inference of scienter because it presumably would make "no sense to purchase that stock if defendants knew the prices to be inflated". *See Mathews v. Centex Telemanagement, Inc.,* [1994–1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,440, at 91,038, 1994 WL 269734 (N.D. Cal. June 18, 1994).

Some of the alleged illegal insider trading consisted of gifts to charities that do not constitute sales for purposes of the securities laws. *Portnoy v. Memorex,* 667 F.2d 1281, 1283 (9th Cir.1982) (bank's con-

tribution to charity of warrants "was a gift not a sale"); *Shaw v. Dreyfus,* 172 F.2d 140, 142 (2d Cir.1949) (holding that bona fide gifts "[c]ertainly ... are not within the accepted meaning of 'sales'" under Section 16(b) of the Securities Exchange Act of 1934).

As to other acts reflective of scienter, there is a reference to Columbia's adoption of a compensation package to reflect the defendants' intent to encourage or commit fraud. Federal courts have rejected this type of allegation as giving rise to inferences of fraud.

> Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. *"[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated."* Therefore, we hold that the existence, without more, or executive compensation dependent upon stock value does not give rise to a strong inference of scienter.

*Acito v. IMCERA Group, Inc.,* 47 F.3d 47 (2d Cir.1995) (quoting *Ferber v. Travelers Corp.,* 785 F.Supp. 1101, 1107 (D.Conn. 1991)). *Accord Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068–69 (5th Cir.1994) and *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994).

Plaintiffs also allege that individual defendants had the motive to commit securities fraud by increasing the value of Columbia/HCA's stock in order to finance acquisitions of other companies (Docket Entry No. 73, Amended Complaint at ¶¶ 76–77). Courts have repeatedly held that such allegations are insufficient to show scienter. *See Salinger v. Projectavi-*

*sion, Inc.*, 972 F.Supp. 222, 233 (S.D.N.Y. 1997) ("It is not sufficient ... [to allege] an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising additional capital.") (citation omitted); *In re Health Mgt., Inc. Sec. Litig.*, 970 F.Supp. 192, 203–04 (E.D.N.Y.1997) (court rejected theory of scienter based upon the defendants "desire to conclude various acquisitions by using inflated value of stock as consideration for mergers and to obtain financing for such acquisitions").

Plaintiffs also advance, the "fraud on the market theory" that in a word, allows for presumed reliance of the plaintiffs on the false or misleading statements or omissions. As *Roeder* pointed out, that theory involves the critical issue of reliance, whereas the real issue in these circumstances is the duty of disclosure of business practices. 814 F.2d at 27.

As to the alleged illegal billing practices as evidence of scienter, there are also no factual allegations that any of these defendants engaged in or directed the alleged illegal practices of upcoding, which is an alleged practice by physicians and/or other hospital staff (Docket Entry no. 73, Amended Complaint at ¶ 32 and 33). *The New York Times* articles on the Texas and Florida hospitals are highly suggestive, but somewhat ambiguous given Columbia's substantial market share and concentration in providing acute care. Moreover, in *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997), the Fifth Circuit declined to accept similar statistical allegations to state a claim of fraud. In *Thompson*, plaintiffs' allegations included a claim that

> in 'reasonable probability, based on statistical studies performed by the United States and others,' approximately 40 percent of claims submitted by defendants for services rendered in violation of the anti-kickback statute or the Stark

laws were for services that were not medically necessary.

*Id.* at 903. The Court affirmed the District Court's dismissal noting that "Thompson provided no factual basis for his belief that the defendants submitted claims for medically unnecessary services other than his reference to statistical studies. There is no indication, however, that these statistical studies directly implicate defendants. Thompson's allegations, therefore, amount to nothing more than speculation and thus fail to satisfy Rule 9(b)." *Id.*

As to cost reports, the allegations are that these reports are maintained at the hospitals. *Id.* at ¶ 37. This revenue cost report or second set of reports is cited as a standard accounting practice in this industry and, given the prospective payment system, this method appears understandable. *Id.* at ¶ 37. Although Columbia's reports are alleged to "materially exceed" the industry norm, no specific facts are provided as to how excessive Columbia's percentages of such may be, given its role as the market leader. The lack of factual specificity precludes a strong inference of fraud.

In addition, in this connection, Columbia had independent auditors (Docket Entry No. 73, Amended Complaint at ¶ 40). The Sixth Circuit ruled that a "company's reliance on the guidance of outside auditors is inconsistent with the intent to defraud." *Stavroff v. Meyo*, 1997 WL 720475, *6, 1997 U.S.App. LEXIS 32774 at 17 (6th Cir. November 12, 1997) (citing *Provenz v. Miller*, 1994 WL 485925 at *3 (N.D.Cal. June 27, 1994)).

For the claims of cost-shifting, there are two specific incidents cited, the Gulf Coast and Olsen Health facilities. *Id.* at ¶¶ 50 and 52. The *Wall Street Journal* article does not specify when or where the alleged cost shifting occurred and such specifics are required under Fed.R.Civ.P. 9(b).

Further, there are no factual allegations that tie the individual defendants to these factual allegations. The conclusion applies with equal force to the conclusory allegations of unbundling. *Id.* at ¶ 57.

As to the acquisition and recruiting practices, as well as the alleged *Stark* violations, in light of *Sofamor,* there was no duty to disclose any opinion about these practices. Further, there are no facts to tie these defendants to these acquisition practices except for Frist's visits to Ohio, Massachusetts, and California to lobby state officials to approve acquisitions. Frist's conduct in this regard is permissible conduct covered by the First Amendment. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137–38, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

Finally, as in *Sofamor,* Columbia disclosed in the materials cited by the plaintiffs that the federal government was questioning its billing practices and the potential consequences (Docket Entry No. 73, Amended Complaint at ¶ 39). Disclosure of risks "negates any inference of scienter". *Worlds of Wonder,* 35 F.3d at 1425. Such disclosures place the investor on notice of potential problems and undermines any "strong inference" of a fraudulent intent to misrepresent or to deceive. There are no allegations with regard to any of these statements from 1994 to 1996, that Columbia officials knew of the federal criminal investigations that surfaced in 1997.

**D. Plaintiffs' Section 20(a) Claims**

█ The plaintiffs present controlling person claims under Section 20(a) of the 1934 Act, which imposes legal responsibilities upon the "controlling person" in a firm for Rule 10b–5 violations. In the Sixth Circuit, if the predicate 10b–5 claims lack merit, then the controlling persons claims under Section 20(a) fail. *Stavroff* at *7 n. 5. In the event the Court declines to adopt the conclusions in plaintiffs' 10b–5 claims, the Magistrate Judge addresses the merits of plaintiffs' Section 20(a) claim.

Section 20(a) of the 1934 Act provides: Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such control person is liable *unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.*

15 U.S.C. § 78n (emphasis added).

For this claim, plaintiffs rely upon the status of the individual defendants holding "senior managerial positions" and their membership on the Executive or Audit Committees (Docket Entry No. 96, Memorandum at p. 28). The individual defendants' "stockholdings" are also alleged to render them controlling persons (Docket Entry No. 73, Amended Complaint at ¶ 93). Plaintiffs also cite the group publication doctrine to impose liability on the individual defendants who signed Columbia's 10–K reports.

The "controlling person" theory is statutory in nature and is separate from any common law theory of liability. This Court ruled that a controlling person can include a director of a corporation, but that to be a controlling person, the person must "at a minimum, ... at times material to the litigation ... act in a manner which directly or indirectly influences the purchase of securities." *Holloway v. Howerdd,* 377 F.Supp. 754, 761 (M.D.Tenn. 1973), *aff'd in part and rev'd in part,* 536 F.2d 690 (6th Cir.1976).

To impose securities liability upon a "controlling person", this Circuit observed

that: "A director of a corporation is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence or awareness of the unlawful activity before the consequences of control may be imposed." *Herm,* 663 F.2d at 686. As to controlling persons, in this Circuit, a failure to investigate cannot serve as a basis for a corporate director's liability. *Id.* at 684.

This Circuit has also dismissed a Section 20 claim against a corporate president, chief executive officer, and chief operating officer where there were no factual allegations that the named defendants had "the practical ability to direct the actions of the people" who committed the violations. *Stavroff* at *7 n. 5 (quoting *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 949 (7th Cir. 1989)).

Under the factual allegations here there is no proof that the individual defendants participated in the alleged illegal acts or had knowledge of them. Plaintiffs use the terms "Columbia," "Individual Defendants," and "Defendants" indiscriminately for the alleged involvement of the defendants in these practices. *See e.g.,* See Docket Entry No. 73, Complaint at ¶¶ 25, 32, 25, 44. These allegations are legally insufficient.

As to holdings of Columbia/HCA stock, Reichardt's and Averhoff's holdings are not set forth (Docket Entry No. 73, Amended Complaint at ¶¶ 11(e) and (f)). The complaint does not state the overall holdings of McWhorter, Long, and Mac-Naughton. *Id.* at ¶¶ 11(d), (h), (i). According to the complaint Frist holds about 2.2% of Columbia's outstanding shares. *Id.* at ¶ 11(c). Scott owns 1.4% of this stock. Because *Stavroff* requires a factual showing of a "practical ability" to control and *Herm* requires "actual participation" in the alleged conduct, the Magistrate Judge concludes that the extent of an individual's stockholding alone does not create a controlling person.

The plaintiffs' allege next that Scott, Frist, Reichardt, Averhoff, and Long signed Columbia's 10–Ks for 1995 and 1996. *Id.* at ¶¶ 11a, 11c, 11d, 113, 11f, 11h and 11i. For the reasons stated earlier on this issue and under *Stavroff,* their signatures alone cannot establish their liability.

As to the individual defendants' status of directors and their membership on corporate committees, "[m]erely because the complaint identifies a corporation's outside directors, various committee assignments and generic responsibilities for every committee," this does not establish a controlling person or special relationship. In *In re GlenFed. Sec. Litig.,* 60 F.3d 591, 593 (9th Cir.1995). Membership on a corporate audit committee that did not set the corporate policy at issue is insufficient. *Bomarko Inc. v. Hemodynamics, Inc.,* 848 F.Supp. 1335, 1340 (W.D.Mich.1993).

Here, plaintiffs' allegations about members of the Executive Committee is that the Committee had the "authority" to review with management certain areas in the absence of the entire Board (Docket Entry No. 73, Amended Complaint at ¶ 11a). Plaintiffs' allegations do not describe how effective or active this Executive Committee actually was, and are unclear as to what its decision making on the alleged illegal practices actually was, if any.

As to the Audit Committee, plaintiffs' allegations refer to Drennen, Greco, Vandewater, and Scott receiving and reviewing internal audit reports. *Id.* at ¶ 78. There is only the allegation that Scott and Vandewater participated with Drennen and Greco in reviewing audit reports on "Meidcare reimbursement issues". Other than the fact that Scott and Vandewater received their reports, there are no allegations that those reports contained false information or revealed any fraudulent

conduct. The Audit Committee consisted at various times, of Reichardt, Averhoff, Long and MacNaughton. *Id.* at ¶¶ 11e, 11f, 11h and 11i. Beyond its membership, there are no other allegations in this complaint about the Audit Committee and the how extensive a role the committee members played in the preparation of the 10–Ks or in auditing the company's operations.

As to Frist and McWhorter, who were chairman and vice-chairman of Columbia respectively for different time periods, such status alone is insufficient to qualify them as controlling or special people. To be a special person, there must be the ability to control as well as power to direct or indirect control or influence on the specific corporate policy that resulted in the primary liability, "and [evidence] that the controlled person violated the securities law". *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 394–95 (11th Cir.1996). In the Sixth Circuit, if the complaint fails to tie McWhorter's and Frist's positions to their practical control over the "actions of the people" who committed the acts giving rise to primary liability on the Rule 10b–5 claim, then dismissal of the Section 20(a) claim is necessary. *Stavroff* at *7 n. 5. Thus, plaintiffs' amended complaint fails to allege facts to establish Frist and McWhorter as controlling persons.

As to the defendants Scott and Vandewater, they were the Chief Executive Officer and Chief Operating Officers respectively (Docket Entry No. 73, Amended Complaint at ¶ p. 11a and 11b). The other allegations are that Scott participated in recruitment of physicians and reviewed an employee's score card. *Id.* at ¶¶ 53 and 55. Vandewater and Scott reviewed audit reports from the internal auditors. *Id.* at ¶ 78. The Magistrate Judge concludes that Scott and Vandewater could be controlling persons under Section 20(a). Yet, with these factual allegations of the amended complaint, the plaintiffs have not presented particularized facts to establish strong inferences of fraud by the defendants that is required under the PSLRA for the predicate 10b–5 liability.

The plaintiffs also rely upon the group publication doctrine to hold Frist, McWhorter, MacNaughton, Averhoff and Scott liable for Columbia's written and other statements about Columbia's practices. Plaintiffs also cite their membership on the Executive or Audit Committees to show their special relationship under this doctrine. The Magistrate Judge observes as a threshold matter that there are not any allegations that any of these defendants signed any 10Q forms (Docket Entry No. 73, Amended Complaint at ¶ 43). The only allegation is that "the defendants caused" them to be filed. *Id.*

In *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433 (9th Cir.1987), the Ninth Circuit explained that under this doctrine

> In cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other "group-published information," it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations.

*Id.* at 1440 (internal quotation and citations omitted). The "group published information" presumption initially was applied to "a narrowly defined group of officers who had direct involvement not only in the day-to-day affairs of [the corporation] in general but also in [the company's] financial statements in particular." *Wool,* 818 F.2d at 1440.

For the current scope of this doctrine of joint liability, in a post-PSLRA decision, a Court defined the requisite allegations:

> [P]laintiffs 'complaint must contain allegations that ... [a particular defendant] either participated in the day to day corporate activities or had a special relationship with the corporation, such as participating in, preparing, or communicating group information at particular times. This doctrine is limited to group published information; it does not hold individual defendants liable for analysts' reports or oral remarks made by others.

*Powers v. Eichen*, 977 F.Supp. at 1040 (quoting *In re GlenFed, Inc.*, 60 F.3d 591, 593 (9th Cir.1995)).

The *Powers* Court explained that the group published information doctrine and its presumption does not extend to outside directors because even though they may be committee members, they did not participate in the corporation's day to day affairs. *Id.* (citing *GlenFed*) Moreover, a "[b]oilerplate day-to-day involvement allegation [is] not sufficiently particular to state a claim against an outside director." *In re Silicon Graphics, Inc. Sec. Litig.*, 1996 WL 664639 at *8 (N.D.Cal. Sept. 25, 1996).

In *Powers*, the Court ruled this doctrine applied to corporate officers who "participated in drafting, reviewing *and* approving the misleading statements." 977 F.Supp. at 1041 (emphasis added and footnote omitted). In the omitted footnote, the Court stated that plaintiffs eliminated any disjunctive pleading about the defendants' roles in publishing the materials at issue. *Id.*

As applied here, there are no allegations that any of these defendants made or authorized the statement of Jim Prescott, "spokesman for Columbia" about the El Paso searches (Docket Entry No. 73, Amended Complaint at ¶ 67) and his statement cannot be imputed to them. Further, from the plaintiffs' allegations about statements in the 10Q reports, these defendants did not sign them. The only allegation is that the "defendants caused the company to file... the Company's 10Q's." *Id.* As to the 10Q's, plaintiffs do not allege that any of these defendants "participated in the drafting, reviewing and approving" these statements. The Magistrate Judge concludes plaintiffs' allegations about the 10Q's reports are insufficient under the group publication doctrine.

As to the 10–K reports, beyond signatures, there are no allegations that any of these defendants drafted those documents or played any significant role in their preparation. It is reasonable to infer that they reviewed these documents before signing them, but without allegations on the extent of their individual involvement with the preparation of these reports, there is inadequate pleading of this doctrine. In light of the PSLRA's creation of a heightened pleading requirement, the Magistrate Judge agrees with *Powers* that corporate officers must draft, review, and approve the 10–Ks to be liable. Such allegations would satisfy the required conscious state of mind to deceive so as to justify imposition of personal liability under PSLRA. Applying *Powers*, there are no allegations that these defendants participated in the "drafting" of these 10–Ks reports to justify invocation of the group published doctrine.

In sum, plaintiffs do not allege facts to show a special relationship to impose personal liability under the group publication doctrine based upon Long, Averhoff, MacNaughton, Frist, and McWhorter being officers, directors or members of the Executive or Audit Committee.

### E. Plaintiffs Section 11, 12(a) and 14 Claims

In Count III, Morse alleges that the defendants violated Sections 11 and 12(2) of the Securities Act and Section 14 of the

Securities Exchange Act because of alleged misstatements and omissions in a Columbia/HCA Registration Statement, Proxy and Prospectus issued in connection with the 1994 merger between Columbia/HCA and Medical Care of America (the "1994 Registration Statement") (Docket Entry No. 73, Amended Complaint at ¶ 76, and 96 through 100).

Section 11 prohibits material misstatements or omissions in registration statements. 15 U.S.C. § 77k(a). As a general rule, for a section 11, a plaintiff need only allege that there was a statement or omission of a material fact that is misleading without proof of scienter. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Violation of Section 12(2) of the Securities Act of 1933 occurs if the defendants made "false representations and/or omissions" in connection with the sale of a securities or investment contract. Section 14 creates a claim for material misstatements or omissions in proxy solicitations. 15 U.S.C. § 78n.

First, MacNaughton and McWhorter cannot be liable on this claim because they were not members of Columbia's Board in 1994 (Docket Entry No. 73, Amended Complaint at ¶¶ 11(a) and 11(i)). As to the other defendants, it is difficult to discern why the statements from the 1994 Registration Statement and Proxy are misleading statements or omissions. Specifically, plaintiffs contend that the 1994 Registration Statement "misrepresent[ed]" that "Columbia was in compliance with the anti-fraud amendments' governing Medicare and Medicaid" (Amended Complaint at ¶ 99).

To the extent, as alleged, the proxy stated or implied Columbia's compliance with applicable laws, for the reasons stated earlier, such opinions are not required to be disclosed and, if disclosed, involves soft information that is not actionable under *Sofamor*.

### F. Summary

In sum, the plaintiffs rely upon Columbia's corporate structure and each defendant's place in that structure to infer illegal conduct described in the affidavit submitted for the federal search warrants. To be sure, Ford's affidavit presents facts of serious wrongdoing in Columbia's operations and "senior management" are implicated, but except for the three persons formally charged, those persons are not defined here. These defendants apparently were not mentioned. Under the cited precedents and the PSLRA, plaintiffs must present specific factual allegations reflecting upon each defendant's conscious state of mind to deceive and such facts have not been pled.

In closing, where Congress has set pleading requirements, the dismissal of a complaint that does not meet the statutory standard, does not necessarily bar a refiling upon more specific facts that are learned later. *See Denton v. Hernandez*, 504 U.S. 25, 34, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992) and *Moore v. Mabus*, 976 F.2d 268, 270–71 (5th Cir.1992) (discussing whether pleading requirements satisfy the provisions of 28 U.S.C. § 1915A and the effect of a prior Order of dismissal). If the Court adopts this report and recommendation, the action would be dismissed subject to appeal, but without prejudice to refile upon disclosing more specific facts.

### IV. RECOMMENDATIONS

For the reasons stated above, the Magistrate Judge recommends that (1) defendant Vandewater's motion to dismiss (Docket Entry No. 75) be granted; (2) the defendants', Columbia/HCA Healthcare Corporation, Thomas F. Frist, Jr., R.

Clayton McWhorter, Carl E. Reichardt, Magdalena Averhoff, T. Michael Long and Donald S. MacNaughton, motion to dismiss (Docket Entry No. 83) be granted and the motion to strike (Docket Entry No. 83) be denied as moot; (3) the defendants', Columbia/HCA Healthcare Corporation, Thomas F. Frist, Jr., R. Clayton McWhorter, Carl E. Reichardt, Magdalena Averhoff, T. Michael Long and Donald S. MacNaughton, motion to take judicial notice of exhibits submitted in connection with their motion to dismiss and strike (Docket Entry No. 86) be granted; (4) Defendant Richard L. Scott's motion to dismiss (Docket Entry No. 90) be granted; and (5) the plaintiffs' motion to take judicial notice (Docket Entry No. 131) be denied. The defendants' motion for oral argument (Docket Entry No. 89) was granted earlier.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed to this Report in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).

**ENTERED** this 30th day of June, 1998.